IN THE SUPREME COURT OF NORTH CAROLINA

No. 132PA15

Filed 15 April 2016

STATE OF NORTH CAROLINA

v.

RANDY CARTER DAVIS

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 768 S.E.2d 903 (2015), finding no error after appeal from judgments entered on 30 September 2013 by Judge Jeffrey P. Hunt in Superior Court, Cleveland County. Heard in the Supreme Court on 22 March 2016.

*Roy Cooper, Attorney General, by Robert M. Curran, Special Deputy Attorney General, for the State.*

*Mark Montgomery for defendant-appellant.*

HUDSON, Justice.

Here we are asked to determine whether expert testimony about general characteristics of child sexual assault victims and the possible reasons for delayed reporting of such allegations constitutes expert opinion testimony, subject to disclosure in discovery under N.C.G.S. § 15A-903(a)(2). We hold that it does, and thus, the State failed to satisfy its statutory obligations when it did not produce summaries of the experts' opinions and the basis for those opinions in response to defendant's discovery requests. However, because we conclude that defendant has

failed to carry his burden of showing prejudice, we modify and affirm the decision of the Court of Appeals upholding his convictions.

In September 2013, defendant stood trial for various sexual offenses alleged to have been perpetrated on two minors, G.S. and L.W.[1]  The State's evidence at trial tended to show the following: defendant was G.S.'s stepfather and he sexually abused her from the time she was around three-and-a-half years old until she was thirteen years old.  At the time of trial, G.S. was thirty-six years old.  As an adult, G.S. had nightmares and trouble sleeping, and she was hospitalized in 2006 for suicidal thoughts.  She also had problems with alcohol dependency.  G.S. never reported the alleged abuse to the authorities until October of 2011, when she was in her mid-thirties; she told her boyfriend when she was sixteen,  and when she was in her early thirties, she told her pastor.  She also reported the abuse to a psychiatrist, Vikram Shukla, M.D., when she was hospitalized in 2006 and to her therapist, Sandra Chrysler, in March 2013.

Dr. Shukla was tendered as an expert in child and adolescent psychiatry, and Ms. Chrysler as an expert in mental health counseling, both without objection.  Both testified to their specific interactions with G.S., but then both also testified more generally regarding the characteristics of child sexual abuse victims and potential

---

[1] As is our custom and per Appellate Rule 4(e), we use the initials G.S. and L.W. to protect the identity of the victims even though the trial proceedings occurred when they were both adults.  N.C. R. App. P. 4(e).

reasons for delayed reporting of allegations of abuse.[2] Once the questioning turned more generalized, defense counsel objected to each and every question, citing Evidence Rules 401 through 403, failure to provide discovery per N.C.G.S. § 15A-903(a)(2), and several provisions of the Constitutions of the United States and North Carolina.[3] Defendant had been provided a curriculum vitae for each expert and a medical records summary for G.S., but was not given a summary of any expert opinion testimony or the basis for any such opinion. Initially, at the close of voir dire, the trial court ruled that these witnesses would not be allowed to give opinions; however, in front of the jury, defendant's objections were ultimately overruled and the trial court allowed the experts to testify to matters that they had "observed."

The State also presented evidence that L.W. was defendant's stepdaughter (by a different mother; G.S. and L.W. are not biologically related). L.W., who is six months older than G.S., testified that defendant engaged in improper sexual conversations with her and attempted to sexually abuse her from the time she was thirteen or fourteen until she moved out of the house at age seventeen. L.W. never reported the abuse until 2011 when she was contacted by a detective.

---

[2] The specific testimony about treatment here referred only to G.S.; however, the more general testimony about child abuse victims and delayed reporting could have pertained to both alleged victims.

[3] In its order allowing review of this matter, this Court dismissed defendant's Notice of Appeal based on constitutional questions.

Additionally, the State elicited testimony from two other alleged victims under Rule 404(b) of the North Carolina Rules of Evidence. Both girls testified that when they were in their early teens, defendant discussed inappropriate sexual matters with them. The State also called to the stand defendant's pastor, who testified that because of "an accumulated amount" of complaints about defendant and teenage girls, defendant was banned from the church premises.

A jury convicted defendant on all charges and defendant appealed. The Court of Appeals determined that defendant received a fair trial free of reversible error. *State v. Davis*, ___ N.C. App. ___, ___, 768 S.E.2d 903, 913 (2015). While defendant argued that the State had failed to provide discovery as required by N.C.G.S. § 15A-903(a)(2), the court determined on appeal that the expert testimony in question (that of Dr. Shukla and Ms. Chrysler) was not opinion testimony "of the type that was required to be disclosed under N.C. Gen. Stat. § 15A-903." *Id.* at ___, 768 S.E.2d at 908. As to Dr. Shukla, the court concluded that he "did not testify that there is a specific constellation of characteristics of sexual abuse victims, did not opine on whether G.S. met such a profile, and did not offer an expert opinion of the type that was required to be disclosed under N.C. Gen. Stat. § 15A-903." *Id.* at ___, 768 S.E.2d at 908. Similarly, as to Ms. Chrysler, the court "conclude[d] that, because Ms. Chrysler's general testimony about sexual abuse victims was limited to her own observation and experience, it did not constitute an expert opinion that had to be disclosed in advance of trial." *Id.* at ___, 768 S.E.2d at 908.

In the Court of Appeals, defendant raised three issues on which that court declined to grant relief. *Id. at* ___, 768 S.E.2d at 905. He repeated all three in his petitions for discretionary review and for writ of certiorari before this Court:

> 1) whether the trial court erred in admitting the opinion testimony of witnesses Shukla and Chrysler; 2) whether the trial court erred in admitting the testimony of other witnesses who claimed that Mr. Davis made inappropriate comments to them; 3) whether the trial court erred in instructing the jury that the complaining witnesses were "victims."

We allowed review by special order to address only "whether the trial court erred in admitting the opinion testimony of witnesses Shukla and Chrysler."

The Court of Appeals reviewed the issue before us for abuse of discretion. *Id. at* ___, 768 S.E.2d at 907. In our consideration of the one issue on which we allowed review, we note that usually "[d]etermining whether the State failed to comply with discovery is a decision left to the sound discretion of the trial court." *State v. Jackson,* 340 N.C. 301, 317, 457 S.E.2d 862, 872 (1995) (citation omitted). Here, however, the question is one of statutory interpretation which we review de novo:

> Had the trial court found the violation, in its discretion it could have imposed any or all of the statutory sanctions, including the sanction requested by defendant at trial . . . . In that case, our task would have been to determine whether the trial court properly exercised its discretion in the choice of a sanction. *Because the court failed to find the violation, however, and consequently failed to exercise its discretion, the ruling is reviewable. Cf. State v. Brogden,* 334 N.C. 39, 46, 430 S.E.2d 905, 909 (1993) (" 'When the

-5-

exercise of a discretionary power of the court is refused on the ground that the matter is not one in which the court is permitted to act, the ruling of the court is reviewable.' ")

*State v. Patterson*, 335 N.C. 437, 455, 439 S.E.2d 578, 588-89 (1994) (emphasis added).

Pursuant to N.C.G.S. § 15A-903(a)(2), "[u]pon motion of the defendant, the [trial] court must order:"

> The prosecuting attorney to give notice to the defendant of any expert witnesses that the State reasonably expects to call as a witness at trial. Each such witness shall prepare, and the State shall furnish to the defendant, a report of the results of any examinations or tests conducted by the expert. *The State shall also furnish to the defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion.*

N.C.G.S. § 15A-903(a)(2) (2015) (emphasis added). It is well settled that "the purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate." *State v. Payne*, 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990) (citations omitted), *cert. denied*, 498 U.S. 1092 (1991).

The central question here is whether the State's expert witnesses gave opinion testimony so as to trigger the discovery requirements under section 15A-903(a)(2). The State contends that Dr. Shukla and Ms. Chrysler only testified to facts; defendant asserts that the testimony of both included a number of expert opinions and that he was entitled to receive via discovery summaries of these opinions and their underlying rationales. *Black's Law Dictionary* defines "opinion" as "[a] person's thought, belief, or inference, esp. a witness's view about [ ] facts in dispute, as opposed

to personal knowledge of the facts themselves," and "opinion evidence" as "[a] witness's belief, thought, inference, or conclusion concerning a fact or facts." *Opinion, opinion evidence, Black's Law Dictionary* (10th ed. 2014). According to Evidence Rule 702(a), an expert may give an opinion "[i]f . . . technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," and if the other requirements of Rule 702 apply. N.C.G.S. § 8C-1, Rule 702(a) (2015). In other words, when an expert witness moves beyond reporting what he saw or experienced through his senses, and turns to interpretation or assessment "to assist" the jury based on his "specialized knowledge," he is rendering an expert opinion.[4] *See id.* We recognize that determining what constitutes expert opinion testimony requires a case-by-case inquiry in which the trial court (or a reviewing court) must look at the testimony as a whole and in context. In doing so here, we conclude that both Dr. Shukla and Ms. Chrysler gave expert opinions that should have been disclosed in discovery.

Specifically, both witnesses offered expert opinion testimony about the characteristics of child sexual abuse victims.[5] Dr. Shukla was asked, "[W]hat have

---

[4] We note that in the lay opinion context, we consider "shorthand statements of fact" or "instantaneous conclusions of the mind" as fact, not opinion. *See, e.g., State v. Lloyd*, 354 N.C. 76, 109, 552 S.E.2d 596, 620 (2001) ("The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence."). Nothing in this opinion affects that precedent.

[5] In the transcript, one can see a clear turning point at which the testimony of each of

you observed in the course of your practice as to some of the manifestations of

childhood sexual abuse?" He responded, at length:

> In the course of my practice as a child, adolescent and adult psychiatrist I work with children who have been abused. Then immediately or later on, in months and years, they come back, at any age, and the manifestations of the abused children who are victimized with sexual abuse can go according to the developmental age of the child. If it's a small child who cannot speak and articulate what happened, this child may role play, role play the trauma, role play what was done to the child. They may role play and act like what happened, doing the actual victimization with a sexual motion that the child is not expected to know and it's a very common understanding of all of us.
>
> They may have terrible dreams but not be able to speak about the dreams. If it is a very young child, they may not have much to go with, what happened. The older the child, of understanding age, developmentally the child may be able to say, "Mommy, mommy, Uncle Tom did this to me," and mommy would say, "What happened?" But the patients says [sic], "Uncle Tommy put his wee-wee in me," the child's interpretation of what Uncle Tom did. And I'm not talking about any particular case; I'm not talking about a specific case.
>
> Older children may or may not be able to verbalize what happened, depending on the circumstances of the abuse. The child may be told this is what we're supposed to do, daddy loves you so daddy can do this, so that the child does not understand that it's wrong. The child may not be objecting to it; they may be okay with it and may not have understanding, and then at some point realizes that something is not really right.
>
> They have complaints about depression or problems that may be emerging, depending on how vulnerable the child is to the genetics of trauma. Some children withstand

---

these experts pivoted from case-specific testimony to more general views based on experience. In Dr. Shukla's testimony, this occurred at page 315 of the transcript; in Ms. Chrysler's, at page 678.

it and go through all right. They will say yeah, it happened, but I'm tough. It happened, I had bad dreams for a month and a day, and I got over it. Others, they are extremely traumatized. They have a mild dose of trauma, it happened one time, I told mom, and mom got rid of the boyfriend, no more problems.

The child will say I remember, I asked a forty-year old woman, she says, "I have not told anybody but you, doctor. Nobody really asked me if I was touched by Uncle Tom. It happened, and my mom, (unintelligible).["] Sometimes the trauma is larger and the genetic vulnerability of the person —- it's genetic; we have no control. We have all these other genes, we have no control. Battered women, bad genes, boom.

We have trauma, depression, nightmares, insomnia, flashbacks. Other symptoms may include depression, suicide attempt. What happened, how was your childhood, did anybody touch you in the wrong places, any trauma, if I don't ask they might not tell me, so I have to be very careful with this initial meeting and the follow-up.

Ms. Chrysler testified:

> Q. Ms. Chrysler, can you tell me what are some of your observations with respect to the child abuse victims that you have treated, both adults and children, as to some of the characteristics that they can and tend to exhibit?
>
> . . . .
>
> A. A lot of the characteristics of someone who has been sexually abused or traumatized, in my experience and education, is that this person has an overall lack of trust, views the world as a very scary and dangerous place. It's often seen that there is a lot of anxiety, a lot of anxiousness, sometimes they can slip into a depressed mood, isolating themselves because of that lack of trust and fearfulness of the world. That is something that I've seen in my work with victims of sexual abuse.

Q. Does it tend to make a difference in what you see whether the person experiences that as an adult or a child?

. . . .

A. It's not different in my experience from what I've seen. My education and my experience tells me that both as a child, adolescent and adult the victims of sexual abuse that I have come in contact with exhibit a lot of the same characteristics, that feeling of guilt and shame about what has happened to them. Like I said a minute ago, just that lack of trust, viewing the world as a scary, dangerous place. You know, also just low mood, that is something that's across the board with victims of sexual abuse.

She further testified:

Q. Are there any certain – are there any – is there any series or cluster of mental health illnesses or symptoms that you have seen in your practice associated with your patients who have been sexually victimized as children?

. . . .

A. Sexual abuse can be the trigger for all sorts of mental illnesses. Some of the illnesses are hereditary, you know, they're in your genes, you know, you're predisposed to having something like bipolar disorder. Something that happens to you that's traumatizing can bring that out. Typically adults with mental illness, severe mental illness, it generally comes out at college age, you know, in their young twenties. Sometimes victims of sexual abuse, this will begin to manifest in the form of high anxiety, sleeplessness, lack of appetite, depressed mood, isolative (sic) behaviors, and based on that, somebody who is predisposed to mental illness, like bipolar disorder, yeah, the trauma could manifest. The trauma could perpetuate something like that.

This testimony goes beyond the facts of the case and relies on inferences by the experts to reach the conclusion that certain characteristics are common among child sexual assault victims. Although not elicited by the typical "Doctor, do you have an opinion?" question, it is plainly expert opinion testimony that the witnesses were prepared to give.

Similarly, both experts also offered expert opinion testimony explaining why a child victim might delay reporting abuse. Dr. Shukla testified as follows:

> Q. What is your observation about whether [child sex abuse] is commonly reported immediately, when children experience sexual abuse or trauma, as opposed to later in life?
>
>  . . . .
>
> A. The immediate effects of sexual trauma may be developmentally related, so a child of understanding age, –- depending on the psycho-socio circumstances, three-year-old, four-year-old, five-year-old, older child, will be able to say something terrible happened, or something happened that makes a person uneasy. If the mother is not paying attention or unwilling to pay attention, then it goes on, and a child may be led to believe that it's normal. Or if you say something, I will kill the whole family, or I will hurt you, or mom will be dead, or some psychological guilt trip.
> So the signs and symptoms of immediate trauma can be depression, can be terrible sleep, acute trauma symptoms, psycho-physiological disturbances, anxiety attacks, panicky feelings, panic attacks, the mind goes in these directions, which is exactly where it will go. There is no linear prediction where the mind will function after a serious trauma, and for a child, sexual trauma is a serious trauma.
> It could be like serious traumas, life and death

-11-

experiences, accidents, World War I, soldiers, bombs, everyone's dead, loses his leg, carried to the hospital, starts having nightmares, flashbacks, depression, alcohol, what have you. It will happen with a combination of these signs and symptoms that occur immediately. And sometimes it does not happen; symptoms of numbness can occur. A child may have a serious problem functioning, but that is one of the common things I see is functional loss, where a child is at school, home, with family or friends, the child is not functioning well academically or be able to verbalize what is wrong. Oh, nothing, I'm fine, may not say anything.

They say years later, may say, only when asked, maybe re-traumatized after twenty years, then the symptoms can begin. When the child who grew us [sic] is a doctor, and the doctor get molested or has to go through a life or death trauma, symptoms can be reactivated. With the mind, we cannot predict what will happen next in this matter.

He continued:

> Q. What have you observed about some of the reasons that children don't report child sexual abuse immediately?
>
> . . . .
>
> A. Children who do not report the sexual abuse are under the impression it's what they're supposed to do. They do not have any avenues, don't have the skills to complain about things because of development and age. The developmental age of a child –- the younger the age, the child is unaware of something between right and wrong. A child is unaware of what is allowed and wrong. Spanking, normal. When does spanking become abuse and when does touching, changing diapers by a caregiver, turn into some form of improper handling of the genitals, because when you change diapers you . . . clean the diaper, you clean the genitals.
>
> And so a child does not have the mental apparatus, and then in certain families, a child is told to say no and

run, but in some families it may be a factor of childhood training when you should say no to some improper physical contact. So physical contact, the child is oblivious of what to say or whether there should be something said, or whether something wrong happened. If it's something the child fails to report, it's a common event, because of the child's development. If it happens to a grownup, that's a different matter. If it happens to a trained child, it's a different matter. If it happens to a child who shows symptoms, somebody walks into it, the child may still think it was okay, why is mom so upset?

I had a case, an eleven-year-old girl, with uncle having performed improper sexual advances. It turned out that she still felt psychologically guilty, responsible, terrible, for having sexual contact with this uncle, family friend, and presently they're dealing with that case.

Q. What are some of the other reasons you've observed why children don't report when things like that happen, if they're old enough to understand that it's wrong?

. . . .

A. The other reasons where children who are understanding to report, it depends on the perpetrator and the person, the child, the victim. And that may be bribing or giving gifts, what the child wants to do, giving permission to be out late. A child, a teenager, usually it's a girl, but really sometimes boys are also sexually abused, and this abuse is not verbalized by these individuals because of shock, disbelief, or they're just understanding that this is a way of expressing love. The threat of killing the mom, killing the whole family, say this and it will be really bad, you'll never see your mom again.

These are some of the reasons why teenaged girls, for example, or older child, seven to eleven years, arbitrarily will think I'm not supposed to talk to mom, mom will be upset, and sometimes they try to talk and mom says you are a liar. Sometimes they talk to a

primary care giver, which you only have two, your mom and your dad, nobody else, stepfather, boyfriend, mom, stepfather, foster families. I work with these families, victims coming from these families. There's nobody to listen to [sic]. Who are you going to turn to if your family does not help? It's like if you go to the police and the police do not help. It's a problem. Who are you going to talk to? So the child does not have ways; that's the reason they don't talk. If they talk and they're discredited, their credibility is undermined.

Ms. Chrysler testified:

Q. What about reporting that abuse? What is your observation and your experience with whether abuse victims tend to report right away, and is there any difference between children and adults in that?

. . . .

A. There's extensive documentation, research, also in my experience, that sexual abuse is not typically reported right away for a lot of different reasons, being afraid that no one will believe them, being fearful of the repercussions after they've told on the person that's perpetrated the crime on them. In fact, I read recently that it's one-third of all sexually abused children in cases, only one-third of incidents were reported, which means that two-thirds of these children out there never feel comfortable, never feel safe enough to share what's happened to them. And so for a lot of reasons, –- should I keep going? It's for a lot of reasons that they don't tell. The primary reason is the one I just mentioned earlier about the classic signs of someone who's been abused are, feeling as though the world is a dangerous place, that no one is going to believe them, the guilt and the shame that's been instilled in them for the length of time that they've been sexually victimized. Children oftentimes go through a grooming period with their perpetrator, will groom them to keep a secret, and not sharing the secret, and the consequences of the secret. And any kind of resistance that the child gives them is

-14-

met with coercion or met with threats about their own safety, about the safety of their own family members. A lot of them are taught to keep the secret at all costs. And for children, it's fairly simple: they believe what adults tell them, especially the younger than six-year-olds, kids that I've seen, they're going to believe what's told them. Nobody's going to believe you if you say that; that's something that they will believe.

Q. What about teenagers?

  . . . .

A. Teenagers as well. I don't remember what the exact statistics are, but generally it's over a year. I think it was something like seventy-eight percent of people tell --

  . . . .

Typically children are going to be telling right away. Teenagers was the question; teenagers as well are conditioned by a perpetrator not to feel comfortable talking about what's happened to them. They're a little bit more difficult to predict, I think. They will, I think for teenagers in my experience and education, eventually come forward. Like I said, one-third of sexually victimized children and adolescents come forward.

  . . . .

Basically what I'm trying to say is it just depends, and typically they don't come forward at all.

  . . . .

Q. What are some of the reasons, in your experience, that people do not come forward?

  . . . .

> A. Typically children and adolescents don't come forward for very many different reasons. One of the most common, though, is the guilt and the shame that they feel. That's the primary reason why a lot of them come to therapy, because they're taught to believe that this is their fault. A lot of them have been groomed, conditioned by the sexual perpetrator, that they are not allowed, can't come forward because of a lot of different reasons. But the main reason is fear.

Again, like the testimony regarding general characteristics of child sexual abuse victims, the experts here drew inferences and gave opinions explaining that these other unnamed patients of theirs had been abuse victims and delayed reporting the abuse for various reasons. These views presuppose (*i.e.*, opine) that the other children the expert witnesses observed had actually been abused. These are not factual observations; they are expert opinions.

The State would have us limit the definition of discoverable "opinion" to that which reaches an ultimate issue: Was the victim sexually assaulted or does she exhibit the "profile" or characteristics of someone who has been sexually assaulted? This definition is far narrower than contemplated by our evidence rules and discovery statutes. As noted above, an expert can, and did here, offer opinions about typical characteristics of child sexual abuse victims.

Early in the trial, after voir dire of Dr. Shukla, the trial court ruled that proposed testimony "about the general characteristics of child sexual abuse and delayed reporting" "should have been given to defendant [in discovery]" and that the

witnesses should not offer such opinions. In response to the trial court's ruling, the State framed the questions as "observations." As shown below, it took the State three attempts to phrase such a question in a manner that the trial court would allow:

> Q. Dr. Shukla, what are some of the reasons that children don't report sexual abuse immediately?
>
> [DEFENSE COUNSEL]: Objection. Same basis.
>
> THE COURT: Sustained.
>
> Q. In your experience, --
>
> [DEFENSE COUNSEL]: Objection. Same basis.
>
> THE COURT: Sustained.
>
> Q. What have you observed about some of the reasons that children don't report sexual abuse immediately?
>
> [DEFENSE COUNSEL]: Objection. Same basis.
>
> THE COURT: Overruled.

The trial court overruled defendant's final objection to that line of questioning and permitted that testimony to proceed. We conclude that, regardless of phrasing, the questions posed by the State and Dr. Shukla's answers to these questions elicited opinions based on his expertise.

Later during the testimony of Dr. Shukla, after a number of such questions, the trial court appears to have ultimately found that the curriculum vitae of each witness was sufficient to satisfy the discovery statute:

> Please let the record show, in the absence of the jury,

relative to Dr. Shukla's testimony, the Court finds that he was accepted without objection as an expert in the field of child, adolescent and adult psychiatry, and was the treating psychiatrist of [G.S.] in 2006, that Dr. Shukla has treated perhaps a thousand child patients that either were or reported that they were victims of sex abuse, that at least approximately thirty days ago the State provided discovery, including Dr. Shukla's medical records, relating to the complainant in this case, and that pursuant to 15A-903, the State provided, in the Court's opinion, adequate notice to the Defendant of its intent to offer Dr. Shukla's testimony as an expert by providing his extensive resume or curriculum vitae, I think is the language of the statute.

Therefore, the Court concludes that the Defendant was not surprised within the meaning of the case law in North Carolina, and that the expert testimony of Dr. Shukla is clearly helpful in instructing to the jury, outweighing any potential for prejudice in that regard to the Defendant.

The Court of Appeals concluded that Dr. Shukla did not testify to "a specific constellation of characteristics of sexual abuse victims, did not opine on whether G.S. met such a profile, and did not offer an expert opinion of the type that was required to be disclosed [in discovery]." *Davis*, ___ N.C. App. at ___, 768 S.E.2d at 908. The Court of Appeals reached similar conclusions regarding Ms. Chrysler's testimony, finally holding that "neither [witness] offered an expert opinion that there exists a 'profile'" with which G.S.'s characteristics were consistent. *Id.* at ___, 768 S.E.2d at 908.

In essentially agreeing with the State that these witnesses' opinions need not have been disclosed in discovery unless they included an opinion that G.S. exhibited characteristics consistent with a "profile" of a child abuse victim, the Court of Appeals

-18-

erred. *Id.* at ___, 768 S.E.2d at 908. We do not agree that an "opinion" is so narrowly defined. Instead, we hold that the testimony at issue did include expert opinions that should have been disclosed previously. Accordingly, we hold that the State failed to comply with N.C.G.S. § 15A-903(a)(2) when responding to defendant's motion for discovery by failing to turn over all the information required by that statute.

Moreover, we conclude that the curricula vitae were not sufficient to prevent "unfair surprise." *See Payne,* 327 N.C. at 202, 394 S.E.2d at 162. The curricula vitae and medical records made it clear to defendant that each witness was going to testify as an expert about his or her own treatment of the victim G.S. (and presumably, the allegations of abuse she reported to them), but there was nothing to alert defendant that the witnesses would give opinions about child sexual abuse victims in general and no preview of what those opinions would be. Had such information been turned over in discovery, defendant would have been able to prepare a possible defense or counterpoint to the expert opinion testimony offered by the State.

Having found error in our de novo review, we now must determine if the error was prejudicial to defendant. Because this was a statutory error, we apply the standard found in N.C.G.S. § 15A-1443(a) (2015):

> A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under

> this subsection is upon the defendant. Prejudice also exists
> in any instance in which it is deemed to exist as a matter
> of law or error is deemed reversible per se.

After careful consideration of all the evidence here, we hold that defendant did not meet his burden of showing a reasonable possibility that, absent the expert opinion testimony, the jury would have reached a different result. First, the expert opinion testimony was elicited specifically in relation to G.S.'s reporting, symptoms, and care; L.W. was not the focus of the expert testimony. Second, as to G.S., although the main issue in this case was her credibility, and the expert opinion testimony could factor into a credibility determination, the record reveals overwhelming evidence corroborating her testimony.[6] During her testimony, G.S. reported being sexually abused by defendant when she was between the ages of three-and-a-half and thirteen. She testified that she was forced to perform oral sex on defendant, and that she had memories of him being in the bath with her as a young girl and touching her inappropriately and forcing her to touch his penis, and of him performing oral sex on her. She also testified that defendant vaginally raped her when she was twelve years old. She testified that she first told her then-boyfriend (now husband) about these events when she was sixteen. She further testified that she told Dr. Shukla about what happened when she was admitted to the hospital for suicidal thoughts in 2006

---

[6] To the extent that the expert opinion testimony related to the charges involving L.W. as well, defendant failed to meet his burden of showing prejudice under N.C.G.S. § 15A-1443(a) in these convictions as well. In light of the corroborating evidence, we do not see a reasonable possibility that the jury would have reached a different result regarding the alleged abuse of L.W.

and that she reported the abuse to Ms. Chrysler when she started seeing her for counseling in 2013.

All of this testimony was corroborated in several ways. First, G.S.'s testimony matched the statement she gave to the police when she first reported the abuse in October 2011. Second, she consistently reported abuse by defendant to Dr. Shukla, her pastor, her husband, and Ms. Chrysler. Third, and importantly, the testimony of L.W., the testimony of the other two Rule 404(b) witnesses, and the testimony of the pastor painted similar pictures of defendant's practice of sexually abusing young girls with whom he had established a trusting relationship. A.J.,[7] one of the Rule 404(b) witnesses, testified that defendant, who was like a grandfather to her, talked to her about sex when she was thirteen years old and instructed her on how to perform certain sex acts. S.W., a second Rule 404(b) witness, testified that defendant was the youth director at her church when she was a teenager and that defendant would initiate sexual conversations and ask her about her sexual interactions with her boyfriend. S.W.'s testimony was corroborated by a friend to whom she had talked about some of defendant's behavior at the time it was happening, by her uncle to whom she had also spoken, and by the pastor at the church. The pastor testified that defendant was banned from church property because of a "gathering of things," including the allegations made by S.W.

---

[7] Again, we use initials to protect the identity of the victims. N.C. R. App. P. 4(e).

Given all the above evidence, we conclude that defendant has failed to show that, absent the expert opinion testimony (as to the generalized characteristics of child sexual abuse victims and reasons for delayed reporting), there is a reasonable possibility that the jury would have reached a different result. We are mindful, though, of the wise words of the Court of Appeals in *State v. Moncree*: "Although we determine defendant was not prejudiced, we note the State should comply with statutory discovery requirements. District attorneys are elected public officials, and therefore North Carolina citizens trust the people who serve as district attorneys." 188 N.C. App. 221, 227, 655 S.E.2d 464, 468 (2008).

Accordingly, for the reasons stated above the decision of the Court of Appeals upholding defendant's convictions is modified and affirmed. The remaining issues addressed by the Court of Appeals are not before this Court and its decision as to those matters remains undisturbed.

MODIFIED AND AFFIRMED.