BRYANT, Judge.
Where the State solicited the expert opinion testimony of its witness without providing defendant with the expert's opinion and basis for it, the State failed to comply with N.C. Gen. Stat. § 15A-903(a)(2), and the trial court erred in allowing the opinion testimony. But where defendant fails to establish prejudice as a result of the error, we hold there was no prejudicial error. Where defendant further appeals from admissions of evidence in contradiction to pretrial orders but fails to establish prejudice from those admissions, we also hold no prejudicial error.
On 16 September 2013, a Gaston County grand jury indicted defendant Sara Ann Reeger on the charge of embezzlement of money in excess of $100,000.00. A superseding indictment indicated that the period of embezzlement spanned from 1 January 2009 to 9 February 2013. In a motion for voluntary discovery, defendant requested the following: "[N]otice ... of any expert witness that the State reasonably expects to call as a witness at trial.... The State shall also furnish to ... defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion."
This matter initially came on for trial during the 13 October 2014 criminal session of Gaston County Superior Court, the Honorable W. Robert Bell, Judge presiding. During the course of a pretrial hearing, the State disclosed that it intended to introduce a voluminous number of financial records (several thousand pages of documents) contained in six notebooks. Following a conference in the judge's chambers, the State moved to continue the case. Over defendant's objection, the trial court granted the motion.
The matter was next set for trial during the 23 March 2015 criminal session, the Honorable Todd Pomeroy, Judge presiding. During a pretrial hearing, defendant notified the court that she had just received discovery that morning.[1] Defendant also stated that the State's witness list had changed, adding an expert in forensic accounting, Mike W. Womble. The State disclosed that Womble had compiled the six binders of financial information provided to defendant the previous October and that Womble would testify to "the summaries of his binders." Defendant asserted that while she had been provided a "box of papers," she had not previously heard of Womble, and there was no indication of who compiled the documents or that person's opinion of the information contained therein. When the court inquired whether the State had provided defendant with Womble's CV, his opinion, and the underlying basis for his opinion in accordance with N.C. Gen. Stat. § 15A-903(a), the State responded, "Each notebook is set up with tabs, and there is a summary at the beginning of each section.... There's 411 tabs in those binders, and he will testify to how he compiled the notebook, how he came up with each summary." Then Judge Pomeroy rendered the following ruling:
In my discretion I am going to ask that the matter be continued under 15A-910, and placed on another calendar. I am ordering the State to provide to ... defendant any opinions, any summaries, any conclusions of Mr. Womble. That is to be provided within thirty days of today's date.
(Emphasis added).[2]
On 24 August 2015, the matter came on for trial by jury, the Honorable Robert T. Sumner, Judge presiding. The evidence presented at trial tended to show that from 2007 to 2013 defendant was employed at Fab-Tec, Inc., a small family-owned business located at 620 Franklin Boulevard in Gastonia. Vice President Dana Bolding testified that she hired defendant as administrative assistant and trained her to perform various duties, including payables, receivables, and payroll. By 2012, defendant dealt with customers and "keying in jobs"-entering purchase orders into the Fab-Tec system to begin the manufacturing process. As defendant became more efficient, Bolding was able to focus less on the "HR part" and "more on customers and getting work in." Defendant's job duties were described as follows:
Q. Can you explain each of [defendant's] duties once she was up to full capacity to the jury so they can understand?
A. Accounts payables is where we either pay for the material up front or the vendor sends in an invoice and it is paid in terms. Accounts receivable is where once we deliver a part we have a side ticket that is turned into an invoice and it is sent to the customer to receive payment. Then payroll, we have a timesheet that is keyed into our accounting software and turned into payroll.
Q. Okay. You said she handled personnel matters. What kind of personnel matters did she handle?
A. If somebody wanted to change taxes or make a change on their address or something, they would go to [defendant].
...
A. I don't know exactly when she started doing each thing, but I know she probably started the payables and receivables after 2008. It would probably be within the first year she took over reconciliation. I am not positive.
Q. Reconciliation was something that was done with you or someone else in the company?
A. No. She was showed how to reconcile on QuickBooks, our accounting software, she done it on her own. You could only do it on one computer.
Bolding testified that defendant was responsible for paying vendors and making out payroll checks for Fab-Tec employees.
Q. You trusted her with all of your finances and the company business?
A. I trusted [defendant] with everything in me. I had no reason not to trust [defendant].
Bolding testified that when issuing payroll checks or checks to vendors, either the vice president signed the checks or a signature stamp with her name on it could be used. Defendant was authorized to use the signature stamp.
In January 2013, a representative from a bank at which Fab-Tec had an account called Bolding to inquire whether Fab-Tec would be making a deposit that day. The representative stated that the bank account was in the negative and that there were still pending checks to be paid. When Bolding checked, Fab-Tec's accounting ledger reflected a positive account balance. Checking the bank's transactional records for the month against Fab-Tec's accounting records, Bolding discovered a wire transfer from the bank account to a Capital One credit card account. The wire transfer had been authorized by defendant and was credited to a credit card account that Bolding did not recognize. Bolding then ran an audit report on Fab-Tec's computer accounting system to view any changes that had been made to the transaction history. Bolding discovered records of checks that had been written to defendant and then altered.
The State called Michael H. Womble to testify to the results of his audit of Fab-Tec and defendant's personal financial records. Womble, a Certified Public Accountant, was accepted without objection as an expert in the area of forensic accounting, income tax, and small business accounting. Womble testified that he reviewed Fab-Tec's bank statements for two accounts held at Carolina Bank for the period of January 2009 through November 2012 and one account held at Alliance Bank for the period of January 2009 through 2013. He also reviewed defendant's personal credit card statements for Capital One Bank, G.E. Capital Retail Bank for Ashley Home Stores and HHGregg, defendant's personal payment records for Verizon Wireless, and statements for defendant's personal BB&T account. Womble also reviewed Fab-Tec's time and attendance records for October 2011 to January 2013 and payroll stubs for October 2011 to January 2013. Womble had arranged this information along with the results of his audit in six binders.
Out of the presence of the jury, the trial court admitted the binders into evidence on the stipulation that they would not be published to the jury. The State indicated that only the summary of the reports would be submitted to the jury as a separate exhibit, Exhibit 27. The trial court admitted Exhibit 27 into evidence and allowed the State's motion to publish the exhibit to the jury. Womble testified that the grand total of payments from Fab-Tec's bank accounts to defendant's personal accounts amounted to $269,617.66, while between 2008 and 2013, the highest annual gross salary defendant was paid at Fab-Tec was $27,449.63. Womble testified that based on his experience and expertise in the field of forensic accounting, the methods defendant used to withdraw money from Fab-Tec's bank accounts were "conducive to hiding money by an employee."
Following the close of the State's evidence, defendant testified and called witnesses to testify on her behalf that she withdrew funds from Fab-Tec accounts at the direction of Vice President Dana Bolding.[3] Following the close of all of the evidence, the jury returned a guilty verdict against defendant for embezzlement in excess of $100,000.00. Defendant was sentenced to an active term of 65 to 87 months. Defendant appeals.
_________________________
On appeal, defendant questions whether the trial court erred by (I) allowing the State to solicit the opinion of Womble as an expert in forensic accounting; (II) overruling and/or modifying a prior court order on the disclosure of expert opinions; and (III) overruling and/or modifying a prior order barring the State from publishing exhibits with highlighted text.
I
Defendant first argues that she is entitled to a new trial, contending the trial court erred by allowing the State to solicit expert opinion testimony from a witness where the State failed to provide defendant with prior notice of the witness's expert opinion, a violation of General Statutes, section 15A-903(a)(2). We agree the trial court erred, but hold the error was not prejudicial to defendant.
We review de novo the question of whether the State complied with the direction of General Statutes, section 15A-903. See State v. Davis , 368 N.C. 794, 797, 785 S.E.2d 312, 314-15 (2016) ("[U]sually determining whether the State failed to comply with discovery is a decision left to the sound discretion of the trial court. Here, however, the question is one of statutory interpretation which we review de novo [.]" (citation omitted)).
"It is well settled that 'the purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence he cannot anticipate.' " Id. at 798, 785 S.E.2d at 315 (quoting State v. Payne , 327 N.C. 194, 202, 394 S.E.2d 158, 162 (1990) ). Pursuant to General Statutes, section 15A-903(a),
[u]pon motion of the defendant, the court must order:
...
(2) The prosecuting attorney to give notice to the defendant of any expert witnesses that the State reasonably expects to call as a witness at trial.... The State shall also furnish to the defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion. The State shall give the notice and furnish the materials required by this subsection within a reasonable time prior to trial, as specified by the court.
N.C. Gen. Stat. § 15A-903(a)(2) (2015).
In State v. Davis , our Supreme Court considered whether opinion testimony by two witnesses testifying as experts in child and adolescent psychiatry and mental health counseling was subject to the discovery requirements of section 15A-903(a)(2). 368 N.C. at 795-98, 785 S.E.2d at 314-15. Prior to trial, the defendant had been provided with the curriculum vitae of each expert and the medical records summary for the child victim of sexual assault; however, no expert opinion summary, or the basis for such opinion, was provided. Id. at 795-96, 785 S.E.2d at 314. At trial, the court ruled that the State's experts could testify to the matters they had observed but were not allowed to give opinion testimony. Id. at 796, 785 S.E.2d at 314. And yet, before the jury, both experts testified about characteristics common among child sexual abuse victims and why a child victim might delay reporting abuse. Id. at 799-802, 785 S.E.2d at 315-17. Our Supreme Court observed that the "testimony [went] beyond the facts of the case and relie[d] on inferences by the experts to reach the conclusion that certain characteristics are common among child sexual assault victims." Id. at 801, 785 S.E.2d at 317. While a determination as to what constitutes expert testimony must be made on a case-by-case basis, "when an expert witness moves beyond reporting what he saw or experienced through his senses, and turns to interpretation or assessment 'to assist' the jury based on his 'specialized knowledge,' he is rendering an expert opinion." Id. at 798, 785 S.E.2d at 315 (citation omitted). On the facts present in Davis ,
[t]he curricula vitae and medical records made it clear to [the] defendant that each witness was going to testify as an expert about his or her own treatment of the victim ... (and presumably, the allegations of abuse she reported to them), but there was nothing to alert [the] defendant that the witnesses would give opinions about child sexual abuse victims in general and no preview of what those opinions would be.
Id. at 809, 785 S.E.2d at 321. Because the State failed to disclose the experts' respective opinions to the defendant in response to the defendant's motion for discovery, and thereby prevent unfair surprise, the State failed to comply with General Statutes, section 15A-903(a)(2). Id. at 808, 785 S.E.2d at 321. Nevertheless, our Supreme Court determined the statutory violation was not prejudicial error. Id. at 808-09, 785 S.E.2d at 321.
Here, defendant filed a pre-trial motion for voluntary discovery requesting that the State provide notice of any expert the prosecution reasonably expected to call as a witness at trial, as well as "the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion." In response, the State provided notice of its intent to call Michael H. Womble, CPA, ABV, CVA, CFFA, CFF, ASA, CGMA,[4] to testify as an expert.
Womble performed an audit of the bank accounts of Fab-Tec and defendant's individual accounts, and at trial, the State submitted the results of Womble's audit along with a separate summary of the reports labeled Exhibit 27. While under oath but out of the presence of the jury, Womble testified that the audit reports and the summary of the reports, labeled Exhibit 27, had been provided to defendant "some months" before trial. Back before the jury, the trial court admitted into evidence the audit summary report as Exhibit 27 and allowed it to be published to the jury. Womble testified that the audit produced 186 checks made payable to defendant totaling $169,719.56; reflected thirty-five payments to defendant's individual credit account, Capital One account number 8310, totaling $18,514.64; reflected 132 payments to defendant's Capital One credit account number 2160 totaling $68,950.84; reflected fourteen payments to defendant's Verizon Wireless account totaling $4,909.92; reflected ten payments to defendant's G.E. Capital Account number 0754 totaling $4,800.00; and thirty-three payroll checks issued as a result of changes defendant made to the number of hours she worked totaling $2,722.70. The grand total for these payments from Fab-Tec's bank accounts to defendant's individual accounts amounted to $269,617.66. Between 2008 and 2013, the highest annual gross salary defendant was paid from Fab-Tec was $27,449.63.
Womble also testified to his opinion that the money transfers did not support a theory that Fab-Tec officers were attempting to shelter money from the IRS.
Q. Based on training and experience with this accounting, would the spending pattern that you just described be conducive to hiding money?
...
[A.]: It would be conducive to hiding money by an employee. It would not be conducive to hiding money by an owner of the company. For example, the evidence in the documents I have seen and have gone through support common methods that employees use to take money from an employer. An owner would generally take money in different ways if that were the case.
For example, an owner would in a very small business is very good at what they do for a living. [sic] ... They have not been trained to run a company and so they are not necessarily very good at accounting. But what virtually every business owner does understand is that if you want to hide money from the Internal Revenue Service or anyone else for that example, you simply just doesn't [sic] put it in a bank account. You go do work for a customer, you don't give that customer an invoice. The customer will pay you in cash. You put the cash in your pocket. Then you go to eat out, go to a movie, go on a vacation or whatever with that cash.
What happened here is that the company apparently did all of the right things. It took and did work for customers. It invoiced them. It collected the money. It put the money in the bank account. It entered the transaction to the company's books and records which would be all of the things that you would not do if you were trying to hide the money.
...
Q. Now, based on your training and experience, is this type of behavior unusual, such a large amount of money over an expanded period of time?
A. Well, unfortunately, it is quite common. In very large businesses, Walmart, Ford Motor Company, Google, Facebook, these companies have professional management that they have hired who have been trained to run their companies. Those big companies have a substantial professional accounting staff. They even have people they call internal auditors whose sole purpose is to look over the shoulders of the professional accounting staff to make sure they are doing the right things. So while these things do happen in the very, very big companies of the world, they just don't go on for very long because they get caught pretty quickly.
But in a very small business, the lumber and construction company, the electrician, the car repair, you know, the local hardware store owner, they don't have the money to have all these professional staff on all of the time to do things the right way. So frequently, these small businesses, they hire somebody that they trust and they put someone that they trust in these key positions that handle money. So then the business owner, they just go and do what they are good at. They go work on cars all day. They go work on plumbing jobs. They go run their hardware store because they trust that other function is being done. They are not looking over that person's shoulder like they would have had they been these professionally trained people.
So then what happens is this trusted person begins to realize that nobody is looking over their shoulder and then there may be a need or an entitlement and they might begin to tack a very small amount. Then they realize after a month or two, they realize, well, hey, nobody caught me. So that kind of emboldens, and it gets larger and larger. Finally, you know, because there is nobody looking over their shoulder, nobody is catching it, it just gets larger and larger and begins to get so large it actually kind of gets out of control.
It takes an event to uncover these things because the owner with its complete trust is not looking for it. So what happens is it takes a phone call from the bank to say, hey, there is no money in your account, you need to put money in here when the owner expected there to be money. It could be when an employee takes a vacation and then all of a sudden they get a strange phone call while that employee is on vacation and then it becomes uncovered at that point. There is any number of ways those things happen but generally it is not the owner actually finding it happened, it is some external source, some source outside the company that kind of points the attention to the fact that something is wrong. So that's why we read about, you know, from time to time these situations to where someone has taken money and it went on for a number of years. It is all too common for those reasons.
While Womble's designation as a CPA, ABV, CVA, CFFA, ASA, CGMA in conjunction with his six-binder audit report makes clear that he would testify as an expert about the financial transactions between Fab-Tec's bank accounts and defendant's individual accounts, there was nothing to put defendant on notice that Womble would give opinions about common practices for individual employees versus small businesses in sheltering money from accounting records. See Davis , 368 N.C. at 798, 785 S.E.2d at 315 ("[W]hen an expert witness moves beyond reporting what he saw or experienced through his senses, and turns to interpretation or assessment 'to assist' the jury based on his 'specialized knowledge,' he is rendering an expert opinion." (citation omitted)). And upon defendant's motion, the State's failure to provide defendant with notice of Womble's opinions or the underlying basis for such, violates General Statutes, section 15A-903(a)(2). N.C.G.S. § 15A-903(a)(2) ("Upon motion of the defendant, the court must order: ... (2) The prosecuting attorney to give notice to the defendant of any expert witnesses that the State reasonably expects to call as a witness at trial.... The State shall also furnish to the defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion ." (emphasis added)).
Having found error, we must now consider whether defendant was prejudiced as a result.
A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.
N.C. Gen. Stat. § 15A-1443(a) (2015).
The unchallenged evidence established that defendant worked at Fab-Tec as an administrative assistant to Vice President Bolding and maintained the accounting and billing records for Fab-Tec. Over the span of time from 1 January 2009 to 9 February 2013, defendant transferred $269,617.66 from Fab-Tec bank accounts to her individual accounts. Of the $269,617.66, defendant transferred funds to repay three personal credit accounts (Capital One 8310: $18,719.56; Capital One 2160: $68,950.84; GE Capital: $4,800.00) and her personal phone bill (Verizon Wireless: $4,909.92). Defendant caused an additional $2,722.70 to be paid to her by increasing her number of hours worked as recorded on Fab-Tec's timesheets. Defendant also cashed checks she issued to herself for a total amount of $169,719.56. Where checks were issued to defendant individually or to defendant's personal credit account holders, Womble testified to observing a pattern in Fab-Tec's computer wherein the accounting system logged a transaction directing payment to defendant and then shortly thereafter, logged an alteration to the transaction history to reflect that payment appeared to have been made to a Fab-Tec vendor, instead. There was also substantial evidence presented that defendant abused prescription medication, specifically hydrocodone pain pills. To acquire them, defendant paid between $300.00 and $480.00 per week over several years. While working at Fab-Tec, defendant's maximum annual gross compensation was $27,449.63.
Thus, given the substantial evidence detailing the manner and length of time in which defendant used Fab-Tec funds to pay her personal expenses, such evidence was sufficient for the jury to find beyond a reasonable doubt that defendant embezzled money from her employer apart from expert opinion testimony regarding common practices of sheltering money from accounting records. Thus, we cannot say that there is a reasonable possibility a different result would have been reached at trial had the opinion testimony not been admitted. Therefore, while the court erred by admitting expert opinion testimony regarding common practices of sheltering money from accounting records where the State failed to provide notice to defendant in accordance with General Statutes, section 15A-903(a)(2), we do not hold this error to be prejudicial. Accordingly, on this point, defendant's argument for a new trial is overruled.
II
Defendant next argues that she is entitled to a new trial where the trial court erred by overruling and/or modifying a prior court order entered by another superior court judge. More specifically, defendant argues, almost as a corollary to Issue I, that where Judge Sumner erroneously admitted Womble's expert opinion testimony into evidence, Judge Sumner implicitly overruled and/or modified the prior order of Judge Pomeroy directing that the State provide defendant with "any opinions, any summaries, [and] and conclusions of Womble" before trial. Due to Judge Sumner's implicit overruling and/or modification of Judge Pomeroy's order, defendant contends she is entitled to a new trial. We disagree.
[I]t is well established in our jurisprudence "that no appeal lies from one Superior Court judge to another; that one Superior Court judge may not correct another's errors of law; and that ordinarily one judge may not modify, overrule, or change the judgment of another Superior Court judge previously made in the same action."
State v. Ross , 216 N.C. App. 337, 343, 720 S.E.2d 403, 407 (2011) (quoting State v. Woolridge , 357 N.C. 544, 549, 592 S.E.2d 191, 194 (2003) ). Where such a circumstance occurs, the remedy is to vacate the second order. See Woolridge , 357 N.C. at 551, 592 S.E.2d at 195.
As we held in Issue I, Judge Sumner erred in allowing Womble's expert opinion testimony into evidence. If viewed as an implicit overruling and/or modification of Judge Pomeroy's prior order, the remedy is to vacate Judge Sumner's implicit ruling admitting Womble's opinion into evidence. As discussed in Issue I, the record does not support a conclusion that there is a reasonable probability that the jury verdict would change even if Womble's expert opinion testimony had not been admitted. Therefore, defendant is not entitled to a new trial on this ground. Accordingly, this argument is overruled.
III
Defendant further argues that the trial court erred by overruling and/or modifying a prior court order barring the State from publishing exhibits to the jury. More specifically, defendant challenges Judge Sumner's publishing as exhibits for the jury highlighted documents and argues that publishing these documents overruled and/or modified a prior order issued by Judge Bell. We hold no prejudicial error.
Pursuant to Rule 9 of our Rules of Appellate procedure "[i]n appeals from the trial division of the General Court of Justice, review is solely upon the record on appeal...." N.C. R. App. P. 9(a) (2015).
Even though an in-chambers conference is not recorded, if the nature and content of the private discussion can be gleaned from the record, for example by a subsequent summary of the conference on the record by the trial court, then the reviewing court may review the record to determine whether the defendant was prejudiced.
State v. Ferguson , 145 N.C. App. 302, 309, 549 S.E.2d 889, 894 (2001) (citations omitted).
The record indicates that during a pretrial hearing before Judge Bell, the court asked the prosecutor and defense counsel to conference with him in judicial chambers. The conference took place off the record. At the conclusion of the conference, Judge Bell returned to court and on the record ordered the case continued. In a later hearing before Judge Pomeroy, the prosecutor informed the court of an order Judge Bell issued to the parties during a conference held off the record, specifying that the jurors were to receive "clean" copies of the exhibits. We note that defendant was present and did not challenge the prosecutor's recitation.
While it is a better practice to summarize the substance of an in-chambers conference or to recite the orders given on the record while still before the same judge that conducted the conference when all parties are present, we can glean the substance of Judge Bell's order from the record. See id. However, as in Issues I and II, defendant does not establish how he was prejudiced by Judge Sumner's admission of exhibits with highlighting on them as an implicit overruling and/or modification of Judge Bell's order. Accordingly, we hold no prejudicial error.
NO PREJUDICIAL ERROR.
Report per Rule 30(e).
Judges CALABRIA and STEPHENS concur

The State described the documents defendant received that morning as victim Fab-Tec's personnel files for defendant and other employees. Defendant noted the documents were in Fab-Tec's possession and dated between 2012 and 2013.

The record reflects that reports prepared by Womble, his curriculum vitae, and any rough notes were provided to defendant during discovery.

Both Vice President Dana Bolding and defendant testified that defendant was in a dating relationship with Bolding's son, David Bolding, Jr., and that defendant and David Bolding, Jr. purchased a house together. Defendant contended that payments made from Fab-Tec bank accounts for defendant's furniture and appliances where made per the direction of Vice President Bolding to help defendant and David Bolding, Jr., furnish their home. Defendant also testified that payments to Verizon were made to reimburse defendant for the use of her phone when it was used for Fab-Tec business.

Michael Womble testified that in addition to being a Certified Public Accountant (CPA), he had acquired a number of other credentials: he was accredited in business valuation through the American Institute of CPAs; he was a certified valuation analyst by the National Association of Certified Evaluation Analysts; he held the credential of master analyst in financial forensics by the National Association of Certified Valuation Analysts; he held the credential of Accredited Senior Appraiser (ASA) by the American Society of Appraisers; he had been certified in financial forensics by the American Institute of CPAs; and he held the credential of Certified Global Management Accounting (CGMA), also issued by the American Institute of CPAs.