STATE v. McCAIL

[150 N.C. App. 643 (2002)]

_____

STATE OF NORTH CAROLINA v. AARON LEE McCAIL

No. COA01-211

(Filed 18 June 2002)

## 1. Evidence— hearsay—unavailable witness

The trial court did not err in an armed robbery and murder case by sustaining the State's objection to a witness's testimony which tended to indicate that a man other than defendant allegedly told the witness that he committed the murder, because: (1) defendant could not prove the alleged confessor's unavailability by reason of his death under N.C.G.S. § 8C-1, Rule 804(a)(4); and (2) even if the confessor was alive but unavailable, his alleged statements would still be inadmissible since a statement tending to expose the unavailable declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the state-

ment, N.C.G.S. § 8C-1, Rule 804(b)(3), and the evidence as a whole does not provide the corroborating circumstances clearly indicative of the trustworthiness of the alleged confession.

**2. Venue— motion for change—pretrial publicity**

The trial court did not abuse its discretion in an armed robbery and murder case by denying defendant's motion for a change of venue, or in the alternative for a special venire, based on pretrial publicity because: (1) there is no showing of prejudicial pretrial publicity when jurors who served in a case all indicate unequivocally that they will decide the case based on the evidence at trial and not on a formed impression or preconceived opinion; and (2) those prospective jurors who had heard about the murder and were ultimately seated on the jury all stated that they could decide the issues in defendant's case solely on the trial evidence and not on information previously learned outside the courtroom.

**3. Discovery— Brady material—information regarding the State's unidentified witnesses—due process**

The trial court did not violate defendant's due process rights in an armed robbery and murder case by denying defendant's pretrial motion requesting Brady material to discover information regarding the State's nine unidentified witnesses, because: (1) the transcript shows that defendant either already possessed the information sought or timely received the requested discovery from the State during the trial; and (2) there is no indication that defense counsel's receipt at that time prevented development of important impeachment evidence, or resulted in ineffective cross-examination of any witnesses or representation of defendant.

**4. Criminal Law— prosecutor's argument—black male defendant's actions characterized as Curious George**

The prosecutor's jury argument in an armed robbery and murder case characterizing a black male defendant's actions of placing his muddy shoe in the victim's car to those of the monkey Curious George, did not constitute reversible error because: (1) the trial court gave a curative instruction ex mero motu after the statement was made to disregard counsel's characterization of defendant even though defense counsel neither requested this instruction nor objected; and (2) even if defendant had objected, the prosecutor's statement did not so infect the trial with unfair-

**STATE v. McCAIL**

[150 N.C. App. 643 (2002)]

ness since substantial evidence had already been presented during the trial of defendant's guilt.

Appeal by defendant from judgments entered 29 October 1999 by Judge Timothy S. Kincaid in Caldwell County Superior Court. Heard in the Court of Appeals 12 March 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General James Peeler Smith, for the State.*

*Edwin L. West, III, P.L.L.C., by Edwin L. West, III, for defendant-appellant.*

CAMPBELL, Judge.

Defendant, a black male, was indicted on 26 May 1998 by the Caldwell County Grand Jury for the armed robbery and murder of Jennifer Butler Cox ("Jennifer"). Defendant pled not guilty and was tried capitally before a jury at the 11 October 1999 Criminal Session of the Caldwell County Superior Court, Judge Timothy S. Kincaid presiding. The following evidence was introduced at trial:

The State's evidence tended to show that shortly before midnight on the evening of 9 September 1995, Jennifer stopped at the Holiday Food Store ("store") on Highway 321 in Lenoir, North Carolina to call her husband from a phone booth. After Jennifer's husband had spoken with her on the phone for only a few minutes, he heard her say, "Oh, my God." He then heard a scream and two "bang" sounds. Jennifer's husband waited ten to fifteen minutes for her to return to the phone to no avail.

At approximately 1:00 a.m. on the morning of 10 September 1995, Patrolman Keith Bass ("Patrolman Bass") spotted a vehicle, later identified as Jennifer's, parked at the store. The vehicle's headlights were shining towards a phone booth (with the phone's receiver off the hook), and the driver's side door of the vehicle was open. Upon approaching the vehicle, Patrolman Bass saw a baby in a car seat. As Patrolman Bass walked along the side of the store, he discovered Jennifer's dead body lying on the ground near a muddy area. An autopsy later revealed that Jennifer's death was the result of a gunshot wound to her upper left arm and chest from a 9 mm. pistol fired at close range.

Lieutenant Tom Deighton arrived at the scene to assist Patrolman Bass in identifying the body. There was no purse nor any other item

in the vehicle from which they could identify Jennifer. However, there were muddy shoe prints found on the driver's seat, as well as mud on the driver's side door and window. Pictures were taken of the muddy areas and shoe prints.

During the investigation, the police spoke with several individuals who were in the vicinity of the store around the time of Jennifer's murder. Aquala Hendrix, one of these individuals, told the police that as she drove past the store around midnight, she saw a white male on the telephone and a teal green vehicle in the parking lot. The vehicle's lights were on and the vehicle's door was open. The vehicle was in the same position when she drove past the store again about an hour later. Douglas Smith, a store employee, also spoke with the police and told them that he saw a suspicious white male in the store on the evening of 9 September 1995 around 11:00 p.m.

Floyd Bethea ("Bethea"), defendant's neighbor, testified that he saw defendant and defendant's friend, Gary Johnson ("Johnson"), on the evening of 9 September 1995 at Friendly Billiards in Lenoir. Defendant was wearing a jogging suit. Bethea saw defendant again sometime after midnight when defendant asked Bethea about selling a pistol for him.

Michelle Tester, Johnson's live-in girlfriend, testified that she and Johnson were awakened by defendant at approximately 3:00 a.m. on the morning of 10 September 1995. Defendant was wearing boots and a burgundy jogging suit. Mud was on the left-hand side of defendant's jogging suit. Defendant told them he had just robbed and killed a white girl.

On 9 September 1995, Patricia McKnight McCail (also known as "Mud Duck") saw defendant leave their apartment around 4:00 p.m. wearing boots and a burgundy jogging suit. He returned to the apartment, seemingly in a hurry, sometime after 2:00 a.m. the next morning and climbed up to the vacant apartment above theirs. The police later found a burgundy jogging suit under a mattress in that upper apartment. Mud Duck was arrested later that year. On 1 February 1996, she and defendant were married by a magistrate while they were both confined to the Caldwell County Jail (the "jail").

The State's evidence also consisted of other testimony from witnesses to whom defendant had made incriminating statements. Angelletta Ferguson, an inmate who communicated with defendant

STATE v. McCAIL

[150 N.C. App. 643 (2002)]

through the "toilet phone system" at the jail,[1] testified that defendant married Mud Duck to keep her from testifying against him. Joseph Huffman, another inmate at the jail, overheard defendant tell Mud Duck (also over the "toilet phone system") not to ruin his alibi. Rich Ouellette, a former police officer who talked with defendant at the jail, testified defendant made several questionable statements to him such as: "I didn't leave any blood [at the crime scene]. I mean I wasn't there to leave blood. I didn't kill no girl. No one saw me there. And I didn't leave no evidence." Thomas Boyd, one of defendant's fellow inmates while he was at the Craggy Correctional Center (the "center"), testified that defendant told him he had killed a white girl who had a baby in her vehicle. Finally, Thomas Conners, another inmate of defendant's at the center, testified that defendant admitted to robbing a girl with a 9 mm. pistol after an unprofitable robbery of a McDonald's restaurant.[2]

Defendant also presented evidence. Stephanie Medlin testified that she had stopped to make a phone call at the store phone booth around 11:30 p.m. on the night of 9 September 1995. While on the phone, she noticed a suspicious white male walking around her. Frightened, Ms. Medlin asked a group of men to watch her as she returned to her vehicle.

John Wilson ("Wilson") and Oscar Brackett ("Brackett"), two corrections officers at the center, testified on defendant's behalf. They were familiar with defendant, as well as prosecution witnesses Conners and Boyd. Wilson testified that Boyd ran the gambling system at the center, and defendant had to receive protective custody at the center because he could not pay his gambling debts. He also stated that both Boyd and Conners were near the top of the prison system's "pecking order." Inmates at the lower end of the "pecking order" were easily victimized physically, financially, and emotionally. Brackett confirmed Wilson's testimony and added that defendant was at the lower end of the "pecking order." Inmates in defendant's position were prone to exaggerate about their crimes to appear stronger.

Defendant also attempted to offer the testimony of Patricia Ann Bradley ("Bradley"). Bradley was the former girlfriend of Ronnie

---

1. Inmates would carry on conversations with one another using the jail plumbing system by draining the toilets, rolling up a newspaper, and speaking into the newspaper.

2. There was also testimony that a McDonald's restaurant in Lenoir was robbed on the morning of 10 September 1995. The restaurant's surveillance video showed what appeared to be a black male wearing a jogging suit as the robber.

Summerville ("Summerville"),[3] a white man Bradley claimed admitted to her that he had shot Jennifer in the arm and chest while another man held her. The State objected to Bradley's testimony on hearsay grounds. Defendant argued Bradley's testimony was admissible as a statement against interest, an exception to the hearsay rule, because Summerville was unavailable. After conducting a *voir dire*, the court sustained the State's objection ruling that it could not "conclude as a matter of law that [Summerville was] unavailable or that his testimony ha[d] that degree of truthfulness or certainty so as to allow the admissibility of the same."

Defendant's trial concluded on 27 October 1999 when the jury returned verdicts of (1) guilty of robbery with a firearm and (2) guilty of first-degree murder under the first-degree felony murder rule and on the basis of malice, premeditation, and deliberation. Under verdict (1), defendant was sentenced to a minimum term of 117 months and a maximum term of 150 months. Under verdict (2), he was sentenced to life imprisonment without parole. Defendant appeals these judgments.

Defendant brings forth four assignments of error. For the following reasons, we find no error in the trial court's judgments.

I.

**[1]** By his first assignment of error defendant argues the trial court erred in sustaining the State's objection to Bradley's testimony, which tended to indicate that Summerville committed Jennifer's murder. We disagree.

Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted" and is not admissible except as provided by statute or by the North Carolina Rules of Evidence. N.C. Gen. Stat. §§ 8C-1, Rule 801(c), Rule 802 (2001). Rule 804 of our rules of evidence provides various exceptions to the general prohibition against the admission of hearsay where the declarant is "unavailable as a witness." One such exception under Rule 804 states that a witness-declarant is unavailable if he is "unable to be present or to testify at the hearing because of death[.]" *See* § 8C-1, Rule 804(a)(4).

In the present case, defendant was unable to prove Summerville was unavailable due to death. Bradley, Summerville's ex-girlfriend, testified on *voir dire* that she had not seen Summerville in some time

---

3. The trial transcript used "Ronnie Summerville" and "Ronnie Summerbell" interchangeably.

and that his sister's boyfriend had informed her that Summerville had been killed in Washington, D.C. Thereafter, an investigator also testified that he had heard Summerville was in the Washington, D.C. area. However, despite their testimony, no additional evidence was presented by defendant that either he, Bradley, or the investigator had actually tried to verify Summerville's alleged presence or death in Washington, D.C. Absent a showing of at " 'least a good-faith, genuine, and bona fide effort to procure the declarant's attendance[,]' " defendant cannot prove Summerville's unavailability by reason of his death under Rule 804(a)(4). *State v. Harris*, 338 N.C. 211, 223 n.1, 449 S.E.2d 462, 468 n.1 (1994) (quoting 32B Am. Jur. 2d *Federal Rules of Evidence* § 265 (1982)).

Furthermore, if Summerville were alive but unavailable, his alleged statements to Bradley would still be inadmissible. Rule 804(b) provides, in part, that a "statement tending to expose the [unavailable] declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement." § 8C-1, Rule 804(b)(3). Here, the investigator also testified that he had interviewed Summerville on 14 September 1995 after first learning of his alleged involvement in the crime. During the interview, Summerville stated that he was on a fishing trip the weekend of Jennifer's murder with two friends and did not return home until the afternoon following the murder. Summerville's statements were corroborated by his friends and neighbors and are directly contrary to the testimony offered by Bradley. Thus, the evidence heard on *voir dire* as a whole does not provide the corroborating circumstances clearly indicative of the trustworthiness of Summerville's alleged confession to Bradley.

II.

[2] By defendant's second assignment of error he argues the trial court erred in denying his motion for change of venue, or, in the alternative, for a special venire because the degree of publicity the case had received made it highly unlikely that he would receive a fair trial in Caldwell County. We disagree.

"Due process requires that [a defendant] receive a trial by an impartial jury free from outside influences." *Sheppard v. Maxwell*, 384 U.S. 333, 362, 16 L. Ed. 2d 600, 620 (1966). If the defendant believes the outside influences in a particular county will prevent him from obtaining a fair trial, he can move for a change of venue or special venire panel. *See State v. Boykin*, 291 N.C. 264, 229 S.E.2d 914

(1976). However, in order to succeed on either of these motions, the defendant must show that:

> '[D]ue to pretrial publicity, there is a reasonable likelihood that the defendant will not receive a fair trial.' *State v. Jerrett*, 309 N.C. 239, 254, 307 S.E.2d 339, 347 (1987). It is within the sound discretion of the trial court to determine whether the defendant has carried this burden. *State v. Madric*, 328 N.C. 223, 226-27, 400 S.E.2d 31, 33-34 (1991). On appeal, the trial court's ruling will not be overturned absent a showing of abuse of discretion. *Id.*

*State v. Kyle*, 333 N.C. 687, 700, 430 S.E.2d 412, 419 (1993).

Prior to trial, defendant moved for a change of venue, or in the alternative, for a special venire. *See* N.C. Gen. Stat. §§ 15A-957, -958 (2001). In support of his motion, defendant submitted evidence of media publicity from September of 1995, following Jennifer's murder, and from May of 1998, when he was arrested for her murder. Defendant's evidence included radio and newspaper stories released after the murder that discussed the circumstances of the crime and quoted residents as being afraid for their safety. Stories released after defendant's arrest mentioned his criminal history, including reports that defendant was completing a prison sentence in Ohio for breaking and entering at the time of his arrest for Jennifer's murder. These news stories also recounted the circumstances of the crime and noted that defendant underwent drug rehabilitation in 1995.

As the trial began, prospective jurors were questioned by the court and counsel regarding what each juror had heard about Jennifer's murder from news stories and/or other individuals. Those prospective jurors who had heard about the murder and were ultimately seated on the jury all stated that they could decide the issues in defendant's case solely on the trial evidence and not on information previously learned outside the courtroom. Our Supreme Court has held that the responses of prospective jurors on *voir dire* are the most persuasive evidence of prejudicial pre-trial publicity. *See State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983). Furthermore, there is no showing of prejudicial pre-trial publicity when "jurors who served in [a] case all indicate[] unequivocally that they [will] decide the case based on the evidence at trial and [] not [on a] formed [] impression or preconceived opinion about the guilt or innocence of the defendant." *State v. Hunt*, 325 N.C. 187, 199, 381 S.E.2d 453, 461 (1989). Since all the jurors made such an unequivocal assertion, there is no reasonable likelihood that defendant did not

receive a fair trial in Caldwell County. Therefore, the court did not abuse its discretion when it denied defendant's motion for change of venue or special venire.

### III.

[3] Defendant's next assignment of error arises from his 5 August 1999 pre-trial motion requesting *Brady* material pursuant to the Due Process Clause of the United States Constitution and the Law of the Land Clause of Article I, Section 19 of the North Carolina Constitution. By this motion, defendant sought to discover information regarding whether the State's nine unidentified witnesses: (1) had initiated contact with the district attorney's office or investigators in defendant's case; (2) had been paid monies or offered any assistance for providing information about the investigation; (3) had recanted prior statements or made inconsistent statements; and/or (4) had any mental, emotional, or substance abuse problems. The State objected and argued defendant was not entitled to the discovery of statements by and information about specific persons who might be called as witnesses until those persons were actually called to testify. On 25 August 1999, defendant's motion for pre-trial discovery materials was denied. We hold that the trial court properly denied defendant's motion.

At common law, no right of discovery existed in criminal cases. *State v. McDougald*, 38 N.C. App. 244, 248 S.E.2d 72 (1978). Therefore, any questions concerning discovery must be resolved by reference to statutes and due process principles. *Id.* Section 15A-903 of our statutes governs the discovery of witnesses' statements by a defendant. *See* N.C. Gen. Stat. § 15A-903 (2001). With respect to statements made by the State's witnesses, Section 15A-903 provides:

> In any criminal prosecution brought by the State, no statement or report in the possession of the State that was made by a State witness or prospective State witness, other than the defendant, shall be the subject of subpoena, discovery, or inspection *until that witness has testified on direct examination in the trial of the case.*

§ 15A-903(f)(1) (emphasis added). This statute is not to be construed as allowing suppression of relevant information, because under *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment[.]" However, § 15A-903 does allow the State to withhold statements or reports in its possession relating to the subject matter of a witness' testimony until after that witness has been called by the State to testify on direct examination and the trial court has ruled favorably on a defendant's motion to discover that information. *See* § 15A-903(f)(2). *See also State v. Kilpatrick*, 343 N.C. 466, 471, 471 S.E.2d 624, 627 (1996).

In the instant case, defendant contends that the information he sought to discover was necessary to provide defense counsel with a pre-trial opportunity to develop important impeachment evidence against the State's witnesses. However, the prosecutor only argued that defendant was not entitled to the information at the time he requested it, i.e., at pretrial. Defendant does not argue that the pre-trial information requested was not eventually turned over to him during the trial. In fact, the transcript shows that defendant either already possessed the information sought or timely received the requested discovery from the State during the trial. There is no indication that defense counsel's receipt at that time (1) prevented development of important impeachment evidence or (2) resulted in ineffective cross-examination of any witnesses or representation of defendant. Thus, defendant's constitutional rights were not violated by the court's denial of his pre-trial discovery motion because "[d]ue process is concerned that the suppressed evidence might have affected the outcome at trial and not that the suppressed evidence might have aided the defense in preparing for trial." *State v. Hardy*, 293 N.C. 105, 127, 235 S.E.2d 828, 841 (1977).

IV.

[4] Finally, defendant argues reversible error was committed when the prosecutor attempted to inflame racial prejudice in the jury by characterizing the actions of defendant, a black male, to those of "Curious George," a monkey in a series of children's books, in the State's closing argument. We disagree.

Trial counsel are generally granted wide latitude in the scope of their arguments. *State v. Rose*, 339 N.C. 172, 203, 451 S.E.2d 211, 229 (1994). "[C]ontrol of counsel's arguments is left largely to the discretion of the trial court." *State v. Alston*, 341 N.C. 198, 239, 461 S.E.2d 687, 709 (1995). Nevertheless, when errors are alleged, this Court must determine whether the arguments in question "so infected the trial with unfairness as to make the resulting conviction a denial of due process[.]" *Rose*, 339 N.C. at 202, 451 S.E.2d at

229 (quoting *Darden v. Wainwright*, 477 U.S. 168, 91 L. Ed. 2d 144, 157 (1986)).

Here, one of the State's theories was that a muddy shoe print was found in Jennifer's vehicle because defendant may have placed his foot in the seat to tie his shoe. The prosecution attempted to link defendant to this shoe print by stating in his closing argument, "And that mud print in the seat—You think, oh, Curious George just ran around with one good foot, his right foot?" Immediately after the statement was made, the judge gave the following curative instruction, *ex mero motu*: "Excuse me, [prosecutor]. Ladies and gentlemen of the jury, you're to disregard counsel's characterization of the defendant." Defense counsel neither requested this instruction nor objected and moved for a mistrial. However, even if he had objected, the prosecutor's statement did not so infect the trial with unfairness because substantial evidence had already been presented during the trial by which the jury could find defendant guilty of the crimes accused. Therefore, although the State's characterization of defendant was improper, no prejudicial error resulted.

Accordingly, for the aforementioned reasons, we find no error in the trial court's judgments.

No error.

Judges GREENE and McGEE concur.