ELMORE, Judge.
 

 *99
 
 Isaac Tyrone Jackson, Jr. (defendant) appeals from a judgment sentencing him to life imprisonment without parole after he was convicted by a jury of first-degree premeditated murder for the shooting death of his ex-girlfriend, Shamekia Griffin. The sole issue on appeal is whether the trial court erred by allowing the State to elicit testimony from a supplemental rebuttal expert, Nicole Wolfe, M.D., that the State first disclosed to the defense during trial, in alleged violation of N.C. Gen. Stat. § 15A-903(a)(2) 's pre-trial expert witness disclosure requirements.
 

 *398
 
 Although the State did not disclose Dr. Wolfe, her opinion, nor her expert report before trial, we hold that defendant failed to demonstrate
 
 *100
 
 the trial court abused its discretion in allowing the State to elicit her limited expert rebuttal testimony. The State explained it sought Dr. Wolfe in direct response to its untimely receipt, right before jury selection, of a primary defense expert's final report, which differed from that expert's previously furnished report. Dr. Wolfe was a supplemental rebuttal witness, not the State's sole rebuttal witness, nor a primary expert introducing new evidence. Defendant was able to fully examine Dr. Wolfe and the basis for her opinion during a
 
 voir dire
 
 examination held eight days before her trial testimony. The trial court set parameters limiting Dr. Wolfe's testimony. And defendant received the required discovery eight full days before Dr. Wolfe testified, four days of which no court was held, providing the defense an opportunity to prepare against her rebuttal testimony. Finally, although the defense moved to continue its expert's
 
 voir dire
 
 examination based on the State's alleged untimely discovery disclosures, it never moved for a continuance of trial or requested more time to prepare for Dr. Wolfe's rebuttal. On this record, we hold that defendant has failed to demonstrate that the trial court abused its discretion in allowing Dr. Wolfe's limited rebuttal testimony and, therefore, that defendant received a fair trial, free of error.
 

 I. Background
 

 The State's trial evidence indicated that, on 19 November 2010, defendant premeditatedly and deliberately shot and killed Shamekia in front of one of their fifteen-year-old sons in an act of domestic violence. Defendant and Shamekia had a long relationship history together and started dating in 1995, when they were around sixteen years old. About three years later, they became parents to twin boys and, after defendant's sister kicked him out of her apartment for selling drugs, defendant moved into Shamekia's apartment. In 2002, defendant was arrested on federal drug charges, later convicted of trafficking cocaine, and served around eight years in federal prison. A few years into his prison sentence, defendant and Shamekia's relationship began to deteriorate. Shamekia eventually stopped visiting defendant in 2007 and their relationship became "distanced." In July 2010, after discovering he had been approved for release to a halfway house that October, defendant attempted to reconcile his relationship with Shamekia. They discussed defendant being a better father to their children, obtaining a legitimate job, and not returning to selling drugs.
 

 A few weeks after defendant's release to the halfway house in October 2010, however, he returned to drug dealing. When Shamekia found out defendant returned to hanging around with the friends he used to sell drugs with, she confronted him about his promise not to deal
 
 *101
 
 drugs, which caused arguments. Defendant continued hanging out with his friends, and they began making remarks about Shamekia having seen other men. When Shamekia confronted defendant about selling drugs, defendant accused her of cheating on him. These arguments continued for several days and progressed in intensity. Shamekia eventually told defendant: "[P]lease don't contact me anymore." By 18 November 2010, Shamekia stopped responding to his accusations. That day, defendant called and texted Shamekia repeatedly until about 3:00 a.m.
 

 On the morning of 19 November 2010, defendant called Shamekia and attempted to visit her at work, but Shamekia refused. Around 3:00 p.m., defendant called Shamekia again. They continued to argue about defendant allegedly lying about not returning to dealing drugs and Shamekia allegedly lying about having seen other people. After the conversation ended, defendant called Shamekia multiple times but was unable to reach her. Around 6:00 p.m., defendant asked his cousin to give him a ride to Shamekia's mother's house in an attempt to locate Shamekia. After Shamekia's mother told defendant everything was fine and instructed him to return to the halfway house, defendant and his cousin left. Around 8:00 p.m., defendant asked a borrow a gun from his cousin and asked his cousin to drive him Shamekia's house. Shamekia's car was not in the driveway, so defendant asked his cousin to drop him off at a nearby McDonalds. After he ate,
 
 *399
 
 defendant called his cousin again, and he picked him up. A short time later, defendant requested to borrow his cousin's car. Defendant then drove around, calling Shamekia and looking for her. Defendant had called Shamekia nearly forty times that day.
 

 Eventually, defendant spotted Shamekia's car driving through the McDonald's drive-thru with one of their sons, and he called her. Shamekia answered but immediately gave the phone to her son. Defendant asked whether Shamekia was with a man, and their son replied: "No." Unbeknownst to Shamekia or their son, defendant followed Shamekia's car back to her house and parked nearby.
 

 After Shamekia and their son went inside and ate, defendant called Shamekia again. Shamekia answered, and defendant demanded to know why she had been refusing to answer his calls. Shamekia accused him of lying about drug dealing; defendant accused her of lying about cheating on him. After their conversation ended, defendant walked toward Shamekia's house and called her again. Shamekia answered and replied "yeah" and then immediately hung up. Defendant then proceeded to enter Shamekia's house at around 8:41 p.m. and fatally shoot her five times in front of their son.
 

 *102
 
 On 13 December 2010, defendant was indicted for first-degree premeditated murder. On 17 December 2010, defendant filed a "Request for Voluntary Discovery," seeking all information discoverable under N.C. Gen. Stat. § 15A-903. On 6 September 2013, the State disclosed its proposed expert witness list, which did not include Dr. Wolfe. On 18 September 2013, the defense alerted the State it might present a diminished-capacity defense.
 

 On 16 February 2015, three months before trial, the defense disclosed Dan Chartier, Ph.D. and Moira Artigues, M.D. as its primary expert witnesses. Chartier, a psychologist, was later tendered as an expert in administering a controversial diagnostic tool called a qualitative electroencephalograph (qEEG). While an electroencephalograph (EEG) measures electrical patterns on the brain that reflect cortical activity, qEEG qualitatively measures a patient's EEG data by comparing it to databases of other patients' EEG data for statistical analysis. A patient's qEEG results are typically processed into topographical "brain maps" reflecting the comparative cortical activity, which the defense argued can provide diagnostic value in identifying relative brain functioning impairment.
 

 The defense furnished Chartier's
 
 curriculum vitae
 
 , a first draft of Chartier's expert report containing his interpretative conclusions of defendant's qEEG results, and notice that Chartier would rely on qEEG to support his opinion that, at the time of the shooting, defendant was incapable of forming the specific intent to kill required for a first-degree premeditated murder conviction. According to Chartier, defendant's qEEG results showed significantly diminished electrical activity in his frontal and central cortex, the brain centers responsible for governing "decision-making, reasoning[,] and impulse control." Based on these results, Chartier opined that defendant suffered from "left hemisphere and frontal lobe dysfunction," a mental disorder not recognized in the Diagnostic and Statistical Manual of Mental Disorders (DSM).
 

 At a pretrial hearing on 12 March, defendant's motion under N.C. Gen. Stat. § 15A-903(a)(2) for the State to disclose all of its experts was heard. That day, the State disclosed Julia Messer Ph.D., a forensic psychologist who had previously examined defendant's capacity to stand trial, as the only expert it forecast calling to rebut a diminished-capacity defense. At the conclusion of the hearing, the trial court ordered that "all expert opinions be disclosed ... within a reasonable time" and that, "[t]o the extent that there is a motion in limine, that's reserved for the trial judge. If there is some question about not being disclosed, that's for the trial judge to decide whether to allow that evidence."
 

 *103
 
 On 17 April, immediately before jury selection, the defense furnished Chartier's final report. In that report, Chartier's ultimate conclusions and opinion remained the same-that is, defendant's qEEG results indicated he lacked the mental capacity to form the specific intent to kill-but Chartier appeared
 
 *400
 
 to have conducted further qEEG analysis, and the black-and-white brain maps included in Chartier's first report were now illustrated in color, enhancing their visual impact.
 

 On 26 May, immediately after jury selection but before empanelment, the State informed the defense and the trial court that it had been "digesting, reviewing and consulting on" Chartier's final report, and first alerted the defense it was filing a
 
 motion in limine
 
 to contest the admissibility of Chartier's testimony regarding the qEEG testing on
 
 Daubert
 
 grounds.
 

 On 28 May, the State began its case-in-chief. On 1 June, outside the presence of the jury, the State first disclosed it intended to call Dr. Nicole Wolfe, a forensic psychiatrist, to testify at Chartier's
 
 voir dire
 
 examination in rebuttal. The State furnished Dr. Wolfe's
 
 curriculum vitae
 
 , and disclosed that it intended to elicit opinion testimony from Dr. Wolfe aimed at discounting the diagnostic utility of qEEG. The defense objected on timeliness grounds, arguing that the State failed to disclose Dr. Wolfe on any pre-trial expert witness lists, had just furnished her
 
 curriculum vitae
 
 , and had not yet furnished her report. The State explained that it only sought Dr. Wolfe in response to Chartier's final April report that was untimely furnished right before jury selection, which the State argued contained "marked differences" from Chartier's first February report.
 

 On Wednesday 3 June, after the State rested its case-in-chief, the trial court requested copies of Chartier's and Dr. Wolfe's reports in preparation for Chartier's
 
 voir dire
 
 examination scheduled the next day. Defense counsel furnished Chartier's reports, but the State advised that, due to the short notice and scheduling issues, it was unable to meet with Dr. Wolfe until the preceding Friday, and it had not yet received her report. Around 4:45 p.m., immediately upon receipt, the State brought Dr. Wolfe's report to one of defendant's trial counsel's offices. Dr. Wolfe's report was a 55-page PowerPoint presentation that contained multiple peer-reviewed journal articles purportedly discounting qEEG's diagnostic utility.
 

 On Thursday 4 June, over defendant's request for a continuance based on the State's untimely discovery disclosures relating to Dr. Wolfe, Chartier's scheduled
 
 voir dire
 
 examination was held. After Chartier was
 
 *104
 
 examined, the trial court allowed Dr. Wolfe to testify in rebuttal. After the hearing, the trial court denied the State's
 
 Daubert
 
 motion entirely, ruling that Chartier's expert opinion testimony and the contested qEEG evidence was admissible. In response, the State requested for the first time that Dr. Wolfe be allowed to testify as a supplemental rebuttal expert witness at trial.
 

 After a lengthy discussion on the propriety of allowing the State to elicit Dr. Wolfe's testimony, the trial court ruled that Dr. Wolfe be allowed to testify in rebuttal within certain parameters:
 

 THE COURT: ... I'm going to let Doctor Wolfe testify. I think generally she can qualify as a forensic psychiatrist. I think she can talk about whether she relies on QEEG, what she knows about the general practice in her field, about similar experts relying upon that methodology, and she can state generally why, in her opinion, it's not a reliable methodology for a forensic psychiatrist to rely upon. Now, you know, beyond that basis, she is not an expert in the administration of QEEG....
 

 The trial court further elaborated:
 

 THE COURT: The main point is that, as I understand it, the [State] does not intend to elicit testimony that [Dr. Wolfe] gleaned from these various articles that she testified about during the hearing before the Court on QEEG. She can testify about her general area of expertise in forensic psychiatry, whether or not she relies on the test, her knowledge about whether other forensic psychiatrists generally rely upon the test, and why it is or is not relied upon. In other words, if [Dr. Wolfe] doesn't rely upon it, it's her understanding generally in the field forensic psychiatrists don't rely upon it because there are questions about its validity.... That's within her field of expertise to say that. She is not an expert in administering QEEG.... [T]estimony about the administration of [QEEG] and interpretation of the results of the type that's talked about in the PowerPoint, that
 
 *401
 
 would not be a proper area for [Dr. Wolfe] to testify to....
 

 Additionally, the trial court prohibited the State from introducing Dr. Wolfe's full report, limiting its admission to only a few slides that it required the State to select and furnish to the defense at that time.
 

 *105
 
 On Friday 5 June, the defense began its case-in-chief and called defendant to testify before the jury. Defendant testified in relevant part that while he remembered everything leading up to and after the shooting, his emotions were running so high because he believed that Shamekia had just admitted to cheating on him, that he did not remember actually shooting Shamekia. But after his memory returned, he saw her lying dead on the floor, realized he was holding a gun, and conceded that he believed he must have shot and killed her.
 

 No court was held on the following Monday or Tuesday. On Wednesday 10 June, the case resumed, and the defense called Chartier to testify. According to Chartier, defendant's qEEG results revealed notable statistical deviations of electrical activity in the frontal and central temporal cortical regions of his brain, particularly in an area "involved in the control of emotions" and "significantly" in the area controlling language ability, which might manifest in "misinterpret[ing] the actions or behavior of others." Based on these results, Chartier opined that defendant suffered from "left hemisphere and frontal lobe dysfunction." He further opined:
 

 Based on these consistent, combined findings from the multiple analyses of [defendant]'s EEG data, it is apparent to a high degree of neuropsychological certainty that this unfortunate gentleman suffers with significant neurocognitive deficits that are consistent ... with[ ] impaired reasoning, judgment, decision-making and impulse control.
 

 Chartier also opined that these neurocognitive deficiencies would be more pronounced when someone is stressed, emotional, or upset.
 

 On Thursday 11 June, after Chartier's testimony, the defense called Dr. Artigues, tendered as an expert in general and forensic psychiatry, to testify. Dr. Artigues performed a forensic psychiatric evaluation on defendant. Based on his interview with defendant and his review of defendant's medical history and records, including Chartier's qEEG report, Dr. Artigues diagnosed defendant with "personality disorder with borderline dependent and antisocial traits and with frontal lobe syndrome." Dr. Artigues conceded that frontal lobe syndrome is not recognized as a medical diagnosis in the DSM, and that he relied on his review of Chartier's qEEG report for this part of his diagnosis. According to Dr. Artigues, defendant's "ability to plan was seriously impaired, if not completely wiped out" and he could not "weigh the consequences of harming Shamekia in a rational way" at the time he shot her. Dr. Artigues opined
 
 *106
 
 that he "d[id] not believe [defendant] could form the specific intent to kill at the time of the shooting."
 

 On Friday 12 June, after the defense rested, the State called Dr. Wolfe, over defendant's objection, and Messer to testify in rebuttal. Dr. Wolfe, a forensic psychiatrist, testified in relevant part that, after having examined peer-reviewed journal articles while researching the diagnostic utility of qEEG, her practice of not using qEEG as a diagnostic tool has not changed. Dr. Wolfe testified that neither she nor any psychiatrist she had worked with at any facility used qEEG for psychiatric diagnostic purposes. According to Dr. Wolfe, qEEG was not helpful "with assisting in a psychiatric diagnosis." She explained that "electrical brain wave activities" as recorded in an EEG have no "particularly defined appearance," and that psychiatric diagnoses tend to consist of a combination of multiple different issues, meaning a patient typically does not have just one diagnosis. Thus, Dr. Wolfe explained, while having a patient's EEG results might be useful in limited circumstances when combined with other diagnostic tools, such as an MRI; standing alone, EEG results are "not useful to [her] clinically at all" and, "in general, [q]EEG is not helpful for diagnosis."
 

 Messer, a forensic psychologist, had previously performed a court-ordered competency evaluation on defendant and had concluded
 
 *402
 
 that he was competent to stand trial. Messer testified that defendant suffered from no mental disorder she could identify that would account for his stated inability to remember the shooting. Messer explained that based on her psychological examination, defendant "demonstrated an ability to form intent, make rational decisions[,] and carry out actions" and, therefore, opined that defendant was capable at the time of the shooting to form the requisite specific intent to kill. Messer also discounted the defense experts' reliance on qEEG to support their opinions, testifying that neither she nor any psychiatrists or psychologists she works with uses qEEG diagnostically.
 

 After the presentation of evidence, the jury convicted defendant of first-degree premeditated murder, and the trial court sentenced defendant to life in prison without parole. Defendant appeals.
 

 II. Analysis
 

 On appeal, defendant contends the trial court violated N.C. Gen. Stat. § 15A-903(a)(2) 's statutory mandates when it allowed Dr. Wolfe's expert rebuttal testimony on the ground that the State violated that statute's discovery requirements relating to expert witness disclosures. We hold that the trial court did not abuse its discretion in allowing Dr. Wolfe's limited rebuttal testimony.
 

 *107
 

 A. Review Standard
 

 As an initial matter, the parties dispute the proper appellate review standard. The State argues that the typical abuse-of-discretion review standard applies to defendant's allegation that the trial court erred in allowing the State to call Dr. Wolfe as an expert witness. Defendant argues that, under
 
 State v. Davis
 
 ,
 
 368 N.C. 794
 
 ,
 
 785 S.E.2d 312
 
 (2016),
 
 de novo
 
 review is proper because N.C. Gen. Stat. § 15A-903(a)(2) imposes a statutory mandate. Defendant misconstrues
 
 Davis
 
 . Abuse-of-discretion review properly applies here.
 

 In
 
 Davis
 
 , after "not[ing] that usually determining whether the State failed to comply with discovery is a decision left to the sound discretion of the trial court,"
 
 368 N.C. at 797
 
 ,
 
 785 S.E.2d at 314
 
 (citation, brackets, and internal quotation marks omitted), our Supreme Court reviewed
 
 de novo
 
 a challenge to the application of N.C. Gen. Stat. § 15A-903(a)(2) when addressing "whether the trial court erred in admitting the opinion testimony of [the State's expert witnesses]."
 

 Id.
 

 (internal quotation marks omitted). The
 
 Davis
 
 Court, however, applied
 
 de novo
 
 review not because N.C. Gen. Stat. § 15A-903(a)(2) imposes statutory mandates, but because determining whether the State's experts' testimonies constituted "expert[ ] opinion[s]" under N.C. Gen. Stat. § 15A-903(a)(2) was a "question ... of statutory interpretation[.]"
 
 Id.
 
 at 797-98,
 
 785 S.E.2d at
 
 315 ;
 
 see also
 

 id.
 
 at 798,
 
 785 S.E.2d at 315
 
 ("The central question here is whether the State's expert witnesses gave opinion testimony so as to trigger the discovery requirements under section 15A-903(a)(2).").
 

 Here, contrarily, the central question is not whether Dr. Wolfe gave discoverable expert opinion testimony that triggered application of N.C. Gen. Stat. § 15A-903(a)(2), but whether the State violated that discovery statute by failing timely to disclose discovery related to Dr. Wolfe. Unlike in
 
 Davis
 
 , addressing the central issue raised here does not require that we interpret N.C. Gen. Stat. § 15A-903(a)(2), and thus the "usual[ ]" abuse-of-discretion review standard applies.
 
 Davis
 
 ,
 
 368 N.C. at 797
 
 ,
 
 785 S.E.2d at 314
 
 .
 

 Under abuse-of-discretion review, "[t]he trial court may be reversed ... only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Cook
 
 ,
 
 362 N.C. 285
 
 , 295,
 
 661 S.E.2d 874
 
 , 880 (2008) (citation and quotation marks omitted).
 

 B. Discussion
 

 Defendant contends the State, within a reasonable time before trial, failed to disclose its intent to call Dr. Wolfe as an expert, or the nature of Dr. Wolfe's opinion testimony, in violation of N.C. Gen. Stat. § 15A-903(a)(2).
 

 *108
 
 "[T]he purpose of discovery under our statutes is to protect the defendant from unfair surprise by the introduction of evidence
 
 *403
 
 he cannot anticipate."
 
 Davis
 
 ,
 
 368 N.C. at 798
 
 ,
 
 785 S.E.2d at 315
 
 (citation and quotation marks omitted). N.C. Gen. Stat. § 15A-903(a)(2) (2015) imposes expert witness disclosure requirements on the State and provides in pertinent part:
 

 (a) Upon motion of the defendant, the court must order:
 

 ....
 

 (2)
 
 The prosecuting attorney to give notice to the defendant of any expert witnesses that the State reasonably expects to call as a witness at trial.
 
 Each such witness shall prepare, and the State shall furnish to the defendant, a report of the results of any examinations or tests conducted by the expert.
 
 The State shall also furnish to the defendant the expert's curriculum vitae, the expert's opinion, and the underlying basis for that opinion. The State shall give the notice and furnish the materials required by this subsection within a reasonable time prior to trial, as specified by the court.
 

 (Emphasis added.) Additionally, once the State has provided discovery under this statute it maintains a continuing duty to disclose additional discovery. N.C. Gen. Stat. § 15A-907 (2015).
 

 Our review of the record reveals, and defendant has failed to demonstrate otherwise, the trial court did not abuse its discretion in allowing Dr. Wolfe's limited rebuttal testimony, even though the State first disclosed her as an expert at trial.
 

 As early as February 2015, the defense knew it was introducing qEEG evidence to support its diminished-capacity defense in part, and that the State intended to call an expert witness to rebut that defense. Although the defense furnished Chartier's first qEEG report at that time, it did not furnish Chartier's final qEEG report until right before jury selection on 17 April. On 26 May, the State explained that, after it had time to review and consult on Chartier's final April report, it was filing a motion
 
 in limine
 
 on
 
 Daubert
 
 grounds to contest the admissibility of Chartier's expert opinion testimony relating to the qEEG testing.
 

 On 1 June, the State disclosed that it intended to call Dr. Wolfe to testify at Chartier's
 
 voir dire
 
 examination to rebut the diagnostic utility of qEEG and furnished her
 
 curriculum vitae
 
 . After defendant objected
 
 *109
 
 on untimely disclosure grounds, the State explained it only sought Dr. Wolfe "in response to [Chartier's final] report [the State] received on the Friday before jury selection began in this case." According to the State, Chartier's final report contained two additional pages of analysis, enhanced the brain mapping images with color, and contained "marked differences" from his first report. Chartier later admitted that his April report was "absolutely different" from his February report and that "further analysis had been done at that point." The trial court was in the best position to determine the extent to which those reports differed, such that the State might not have reasonably forecast calling Dr. Wolfe in rebuttal until after it had time to review and consult on Chartier's final report.
 

 On the morning of 4 June, the defense was able to review Dr. Wolfe's report, and after Chartier's
 
 voir dire
 
 examination, it was afforded the opportunity to fully examine Dr. Wolfe, her credentials, and the basis for her opinion. After the trial court ruled to allow Dr. Wolfe's rebuttal testimony, it set parameters limiting her testimony and restricting the use of her report to only a few slides that it required the State to identify and furnish to the defense that day. Although the State did not disclose its intent to call Dr. Wolfe in rebuttal at trial until after Chartier's
 
 voir dire
 
 examination and its
 
 Daubert
 
 motion was denied, Dr. Wolfe did not actually testify until 12 June.
 

 Defendant received all required discovery eight days before Dr. Wolfe testified in rebuttal at trial, and no court was held on four of those days. The State's disclosures were thus made in time for effective use at trial.
 
 Cf.
 

 State v. Jackson
 
 ,
 
 340 N.C. 301
 
 , 317,
 
 457 S.E.2d 862
 
 , 872 (1995) (concluding that the trial court granting a four-day continuance "afforded the defense opportunity to meet [previously undisclosed lay opinion testimonial] evidence"). Further, the State did not call Dr. Wolfe to introduce entirely new evidence,
 
 *404
 
 but to rebut the qEEG evidence defendant had intended months earlier to introduce. Defendant thus cannot complain that he was "unfair[ly] surprise[d] by the introduction of evidence he [could ]not anticipate."
 
 Davis
 
 ,
 
 368 N.C. at 798
 
 ,
 
 785 S.E.2d at 315
 
 (citation and quotation marks omitted).
 

 Moreover, although the defense attempted to move for a continuance before Chartier's
 
 voir dire
 
 examination on untimely discovery disclosure grounds, the defense never moved for a continuance after the trial court ruled to allow Dr. Wolfe to testify in rebuttal at trial.
 
 Cf.
 

 State v. Herrera
 
 ,
 
 195 N.C. App. 181
 
 , 199,
 
 672 S.E.2d 71
 
 , 83 (2009) ("[A]ssuming,
 
 arguendo
 
 , that the State did violate the discovery statute provisions, ... we conclude the trial court did not abuse its discretion in allowing this
 
 *110
 
 testimony
 
 especially when defendant did not request a recess or continuance to address this newly disclosed evidence
 
 ." (emphasis added) ). Nor did the defense indicate that it had inadequate time to prepare effectively to develop meaningful impeachment or rebuttal evidence for Dr. Wolfe's cross-examination.
 
 Cf.
 

 State v. McCail
 
 ,
 
 150 N.C. App. 643
 
 , 652,
 
 565 S.E.2d 96
 
 , 102 (2002) ("There is no indication that defense counsel's receipt at that time (1) prevented development of important impeachment evidence or (2) resulted in ineffective cross-examination of any witnesses or representation of defendant."). Accordingly, defendant has failed to demonstrate that the trial court abused its discretion in allowing Dr. Wolfe's limited rebuttal testimony.
 

 III. Conclusion
 

 Defendant's allegation that the trial court erred by allowing Dr. Wolfe to testify in rebuttal due to the State's alleged discovery disclosure violations raised no issue requiring we interpret N.C. Gen. Stat. § 15A-903(a)(2). Accordingly, unlike in
 
 Davis
 
 , the usual abuse-of-discretion standard applies to the question presented here.
 

 Although the State failed to disclose, within a reasonable time before trial, Dr. Wolfe as a rebuttal expert witness, her opinion, or her report, the State explained it only sought Dr. Wolfe in response to Chartier's untimely furnished final report, which it believed differed significantly from his first report. The trial court was in the best position to determine whether Chartier's reports differed such that the State would not have reasonably forecast calling Dr. Wolfe to rebut Chartier's expert testimony or the qEEG evidence until after the State had time to review Chartier's final report. Additionally, the defense was afforded the opportunity to fully examine Dr. Wolfe at Chartier's
 
 voir dire
 
 examination; the trial court limited Dr. Wolfe's rebuttal testimony and the use of her report; the defense was furnished all required discovery eight days before Dr. Wolfe testified, and no court was held on four of those days; and defendant never moved for a continuance of trial or requested additional time to prepare for Dr. Wolfe's rebuttal testimony.
 

 On this record, defendant has failed to demonstrate that the trial court's ruling was so arbitrary that it could not have been the result of a reasoned decision. Accordingly, we hold that the trial court did not abuse its discretion in allowing Dr. Wolfe's limited rebuttal testimony and, therefore, that defendant received a fair trial, free of error.
 

 NO ERROR.
 

 Judges DIETZ and INMAN concur.