IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-653

No. COA20-446

Filed 7 December 2021

Cumberland County, No. 18 CVS 5727

ELIZABETH ANN CLARK, Plaintiff,

v.

ADAM MATTHEW CLARK and KIMBERLY RAE BARRETT, Defendants.

Appeal by Defendant from judgment entered 17 September 2019 and order entered 30 October 2019 by Judge Mary Ann Tally in Cumberland County Superior Court. Heard in the Court of Appeals 12 May 2021.

*The Charleston Law Group, by Jose A. Coker and R. Jonathan Charleston; The Michael Porter Law Firm, by Michael Porter, for Plaintiff-Appellee.*

*Tharrington Smith, LLP, by Jeffrey R. Russell and Evan B. Horwitz, for Defendant-Appellant.*

WOOD, Judge.

¶ 1 On September 17, 2019, a jury found Defendant, Kimberly Barrett, ("Defendant Barrett") liable for intentional infliction of emotional distress ("IIED") and alienation of affection. Post-trial, Defendant Barrett filed a motion for judgment notwithstanding the verdict ("JNOV"), which was denied. On appeal, Defendant Barrett contends the trial court erred in admitting expert witness testimony; allowing Plaintiff, Elizabeth Clark, ("Plaintiff") to proceed with her IIED claim; and denying

her motion for JNOV. After careful review of the record and applicable law, we conclude there was no error at trial and affirm the trial court.

## I. Factual and Procedural Background

¶ 2        Plaintiff married Defendant, Adam Clark, ("Defendant Clark") on April 3, 2010. At the time of their marriage, Defendant Clark held the rank of Captain in the United States Army. In or around May 2010, Plaintiff placed a personal advertisement on the website Craigslist, through which she met a man with whom she had a sexual affair. Plaintiff's extramarital affair lasted approximately ten months.

¶ 3        Plaintiff testified Defendant Clark was unaware of her affair, and the couple remained together and attended several "marriage retreats" provided by the Army. During these retreats, Plaintiff and Defendant Clark completed "exercises of trying to open up to your spouse, reconnect[ing] . . . . [T]hey go into forgiveness of things." The couple "wrote each other letters on trying to put the past behind [them] and move forward, how much [they] really loved each other." Thereafter, the couple procreated two children in 2014 and 2015, respectively.

¶ 4        In the spring of 2016, Defendant Clark attended a training at Fort Belvoir, Virginia. While staying at Fort Belvoir, Defendant Clark met Defendant Barrett, a Lieutenant Colonel in the Army and a staff obstetrics and gynecology physician. At the time Defendants Clark and Barrett met, Defendant Barrett knew Defendant

Clark was married, but felt Defendant Clark "did not have a good relationship" with his wife.

¶ 5         While at Fort Belvoir, Defendants Clark and Barrett resided in barracks. The barracks were "like a U shape and it was two floors and [Defendants Clark and Barrett] were [in] the same . . . building, but [Defendant Barrett] was down on the other end." While attending their training, Defendants Clark and Barrett spent time "all alone in each other's rooms."

¶ 6         Defendant Barrett testified that her relationship with Defendant Clark started by Defendant Clark "helping [her] with homework or papers. Sometimes [she] had questions. There is a lot of acronyms in the—field, but in the military, there are a lot of acronyms that [she] wasn't familiar with." After Defendants Clark and Barrett met each other, Plaintiff "notice[d] a little bit of change" in her husband. Defendant Clark did not travel home to North Carolina to visit and "wasn't texting [Plaintiff] as often. One time [Plaintiff] couldn't get ahold of him and [she] tried calling his hotel room, [but he] wouldn't pick up when he was supposed to be in there . . . . He was short with [her] on the telephone." Because of the changes she noted in Defendant Clark's behavior, Plaintiff used her cellphone to "trace or track" Defendant Clark's cellphone, during which time Defendant Clark's phone was "showing a different location from where his room was at." Defendant Clark's phone was "pinging . . . from the other end of the hall," from where Defendant Barrett's room was located.

¶ 7         On or around July 4, 2016, Defendant Clark traveled home to North Carolina for Independence Day.  While he was home, Plaintiff discovered he "was texting a female. [She] found a number in his phone."  When Plaintiff asked Defendant Clark who the female was, he replied, "I don't know what you're talking about."  Finding the phone number caused Plaintiff "a lot of emotional distress."  The couple argued, and Plaintiff experienced "stroke-like symptoms" and went to the hospital for treatment.  Plaintiff was ultimately diagnosed with "[m]igraines and stress."  Defendant Clark returned to Fort Belvoir the same day Plaintiff was hospitalized.

¶ 8         In September 2016, Plaintiff discovered text messages between Defendants Clark and Barrett, in which Defendant Clark sent Defendant Barrett a picture of his penis.  The picture sent was taken in a bathroom in Plaintiff and Defendant Clark's home.  At the time Plaintiff discovered the sexually explicit photograph, Defendant Clark had changed Defendant Barrett's name in his cellphone's contact information to "Jane S."  Plaintiff knew "Jane S." was Defendant Barrett because she had matched the cellphone number of "Jane S." with that of Defendant Barrett.

¶ 9         On September 11, 2016, Plaintiff confronted Defendant Clark and asked if he "still had [Defendant Barrett's] number."  Plaintiff threatened to call Defendant Barrett, and Defendant Clark "jumped up really fast and chased after [Plaintiff] as [Plaintiff] was dialing [Defendant Barrett's] number."  Plaintiff threatened to ask Defendant Barrett if she and Defendant Clark were having an extramarital affair.

Because of this interaction, the couple fought, and Defendant Clark left their marital home.

¶ 10    Although Defendant Clark left the marital home in September 2016, the couple maintained an emotionally and sexually intimate relationship. Plaintiff testified, "It was very complicated, because he would keep coming over . . . . And he was holding me and we had sex a couple of times." In January 2017, Plaintiff and Defendant Clark purchased real property together. The property the couple purchased was owned by a close family friend of Plaintiff's, whom she knew through her father. Ultimately, the loan obtained to purchase the land was put in Defendant Clark's sole name, because Plaintiff "didn't really have any kind of credit or anything like that." At the time the real property was purchased, Defendant Clark and Plaintiff "were actually reconciling at that time. And [Defendant Clark] told Plaintiff that . . . [they] were] going to still build a house on it." At the time of trial, Defendants Clark and Barrett had built a house on the land and were residing on this property together.[1]

¶ 11    In March 2017, Plaintiff and Defendant Clark executed a separation agreement, in which Defendant Clark agreed to pay $1,850 in monthly child support. The separation agreement was drafted by Defendant Clark's attorney, and Plaintiff

---

[1] Defendant Barrett testified she moved into the house built on the property in "November or December of 2018." Testimony at trial further suggests Defendants Clark and Barrett began living together in 2017. Specifically, Defendant Barrett stated she lived independently for approximately four months beginning in August 2017. When asked where she resided afterwards, Defendant Barrett utilized her Fifth Amendment privilege.

was not represented by independent counsel at the time of its execution.

¶ 12        Throughout June and July 2017, Plaintiff and Defendant Clark engaged in sexual intercourse and recorded videos of themselves doing so. Also in July 2017, Defendant Clark and Defendant Barrett conceived a child together through *in vitro* fertilization. Defendant Clark continued to maintain an intimate and sexual relationship with both his wife and with his paramour during this time. In August 2017, Defendant Clark traveled to Boston, Massachusetts for additional training. Plaintiff attempted to videocall Defendant Clark through Facetime, but Defendant Clark did not answer. When Defendant Clark did not answer, Plaintiff "sent him a topless photo," in which Plaintiff's naked breasts were exposed. Plaintiff did not send the topless photograph to anyone else.

¶ 13        In September 2017, Plaintiff and Defendant Clark stopped having sexual intercourse. Around this time, Defendant Clark began complaining about the amount he paid to Plaintiff in child support. In October 2017, Plaintiff and Defendant Clark were still texting one another, and Plaintiff sent Defendant Clark "a picture of female genitalia." It was around this time that Plaintiff discovered Defendant Barrett was pregnant with Defendant Clark's child.[2]

¶ 14        In January 2018, Plaintiff discovered a Craigslist advertisement and believed

---

[2] Defendants Clark and Barrett had a child together on March 7, 2018. Defendant Clark is listed as the child's father on the birth certificate, and the child bears his last name.

it to be about herself.  The advertisement stated,

> Liz is super hot! Shows you what plastic surgeons and eating disorders can do for you in 2018. There's a reason she's been divorced twice and can't take care of her kids. She's a plaything, nothing more. Hope you fellas are wearing condoms, she's got herpes.

¶ 15          Plaintiff believed Defendant Clark posted the advertisement, because he "always said [she] had an eating disorder and when [they] started not getting along, he said that [she] didn't take care of [her] children and [she] was a bad mother."

¶ 16          In March 2018, Plaintiff began interacting with Defendant Clark, who was using the alias "Brian Bragg" on the social networking platform, Kik.[3]  The Brian Bragg[4] account sent Plaintiff the "topless photo," with a message saying, "Saw this floating around the internet in the Fayetteville chat rooms just letting you know." Brian Bragg also informed Plaintiff that the image was "all over the place," and that he hoped Plaintiff "[slept] well knowing [her] fun bags [were] hanging out there for the world to see."

¶ 17          In May 2018, Plaintiff discovered a Facebook "weight loss" advertisement depicting Plaintiff.  The advertisement was composed of a post-pregnancy photograph of Plaintiff next to the photograph of Plaintiff's nude breasts. Prior to Plaintiff finding

---

[3] When asked if Defendant Clark used the alias "Brian Bragg," Defendant Clark pled the Fifth Amendment.

[4] Plaintiff believed "Brian Bragg" was Defendant Clark, as the "Brian Bragg" account used a photograph that Plaintiff took of Defendant Clark as a profile picture.

the advertisement, "Brian Bragg" had threatened to find and post Plaintiff's post-pregnancy photographs on Kik.

¶ 18      Throughout 2018, Plaintiff's friends and co-workers contacted her when they saw "Liz Clark" profiles, using a photograph of Plaintiff as a profile picture, in Kik chatrooms soliciting "no strings attached sex." Kik business records revealed that the "Liz Clark" Kik profiles could be traced to an IP address that matched the IP address of Defendants Clark and Barrett's residence.

¶ 19      When Plaintiff's friends and co-workers notified her that they saw the "Liz Clark" Kik profiles, she "was extremely embarrassed" and her "heart started racing." Plaintiff also received photographs from "Brian Bragg" depicting herself and her vehicle. Attached to these photographs were messages discussing how people were following Plaintiff. One message from "Brian Bragg" stated, "We are going to continue doing everything in our power to make your life miserable."

¶ 20      In August 2018, Plaintiff brought the instant action, asserting claims against both Defendants Clark and Barrett for libel *per se*; intentional and negligent infliction of emotional distress; and a violation of N.C. Gen. Stat. § 14-190.5A, a statute providing criminal sanctions for what is commonly known as "revenge porn." Plaintiff asserted additional causes of action against Defendant Barrett for alienation of affection and criminal conversation. In April 2019, Defendant Clark was arrested for stalking and cyberstalking Plaintiff in violation of N.C. Gen. Stat. §§ 14-277.3(A)(c)

and 14-196.3.

¶ 21        In July 2019, the Cumberland County Superior Court barred the use of expert witness testimony in the civil actions filed by Plaintiff based upon a motion filed by Defendants Clark and Barrett to strike Plaintiff's tardy designation of an expert witness.  The case proceeded to trial in August 2019. During trial, Derek Ellington ("Ellington") was permitted to testify. Ellington is a digital forensics examiner in Cumberland County.  During Ellington's testimony, he laid the foundation for the entry of a flash drive containing nearly 32,000 files that he preserved from Plaintiff's electronic devices, and social media and email accounts.  The data Ellington gathered and saved demonstrated that Plaintiff had only sent the "topless photo" of herself to Defendant Clark.

¶ 22        The jury found Defendant Barrett responsible for alienation of affection and IIED.  The trial court entered judgment against Defendant Barrett for alienation of affection and IIED on September 17, 2019.  Plaintiff was awarded $1,200,000 in damages.  On September 25, 2019, Defendant Barrett filed a motion for judgment notwithstanding the verdict ("JNOV") and, in the alternative, motion for new trial. The court denied Defendant Barrett's motion on October 30, 2019.  Defendant Barrett appeals from both the September 17, 2019 judgment and the October 30, 2019 order denying her post-trial motion.

## II.    Discussion

Defendant Barrett raises several issues on appeal. Each will be addressed in turn.

## A. Ellington's Testimony

Defendant Barrett contends the trial court erred "by admitting evidence and testimony from an expert witness who was not qualified as such." We disagree.

### 1. *Standard of Review*

As a preliminary matter, the parties dispute the proper appellate standard of review. Defendant Barrett asks this Court to review the admission of Ellington's testimony *de novo*, because "[w]here the plaintiff contends the trial court's decision is based on an incorrect reading and interpretation of the rule governing admissibility of expert testimony, the standard of review on appeal is *de novo*." *Cornett v. Watauga Surgical Grp., P.A.*, 194 N.C. App. 490, 493, 669 S.E.2d 805, 807 (2008) (citations omitted). Conversely, Plaintiff contends the appropriate standard of review is one of an abuse of discretion. Rule 104(a) of our rules of evidence provides that "preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court." N.C. Gen. Stat. § 8C-1, Rule 104(a) (2020). Decisions made under Rule 104(a) are addressed to the sound discretion of the trial court. *See State v. Fearing*, 315 N.C. 167, 174, 337 S.E.2d 551, 554 (1985).

After careful review of the applicable law, we review *de novo* whether Ellington

testified as an expert witness. *See State v. Broyhill*, 254 N.C. App. 478, 488, 803 S.E.2d 832, 839 (2017) (citation omitted); *see also State v. Jackson*, 258 N.C. App. 99, 107, 810 S.E.2d 397, 402 (2018) (noting that the Court applied a *de novo* standard of review "because determining whether the State's experts' testimonies constituted expert opinions . . . was a question" of law.) (citing *State v. Davis*, 368 N.C. 794, 797-98, 785 S.E.2d 312, 314-15 (2015)). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and internal quotation marks omitted). However, whether the trial court erroneously admitted Ellington's testimony is reviewed for an abuse of discretion. *See Crocker v. Roethling*, 363 N.C. 140, 143, 675 S.E.2d 625, 628-29 (2009) (citation omitted); *see also State v. Turbyfill*, 243 N.C. App. 183, 185-86, 776 S.E.2d 249, 252 (2015) (citation omitted). "Abuse of discretion results where the Court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Turbyfill*, 243 N.C. App. at 185-86, 776 S.E.2d at 252 (citation omitted).

### 2. *Whether Ellington's Testimony Constitutes Expert Testimony*

¶ 27      The parties next dispute whether Ellington testified as an expert or gave a lay opinion. "Our Supreme Court . . . explained the threshold difference between expert opinion and lay witness testimony." *Broyhill*, 254 N.C. App. at 485, 803 S.E.2d at 839

(citing *Davis*, 368 N.C. at 798, 785 S.E.2d at 315). "[W]hen an expert witness moves beyond reporting what he saw or experienced through his senses, and turns to interpretation or assessment 'to assist' the jury based on his 'specialized knowledge,' he is rendering an expert opinion." *Davis*, 368 N.C. at 798, 785 S.E.2d at 315 (quoting N.C. Gen. Stat § 8C-1, Rule 702(a)). "Ultimately, 'what constitutes expert opinion testimony requires a case-by-case inquiry' through an examination of 'the testimony as a whole and in context.'" *Broyhill*, 254 N.C. App. at 485, 803 S.E.2d at 839 (quoting *Davis*, 368 N.C. at 798, 785 S.E.2d at 315).

¶ 28     Here, Ellington testified about the general process for making a forensic or digital copy of electronic devices and specifically testified as to how he made a copy of Plaintiff's electronic devices. Ellington's testimony laid the foundation[5] for a flash drive containing files from Plaintiff's devices, demonstrating Plaintiff did not send the "topless photo" to anyone other than Defendant Clark.  A review of Ellington's testimony reveals that he testified not as an expert, but as a lay witness.  Ellington testified as to what he "saw or experienced" in creating copies of Plaintiff's devices and accounts. He did not interpret or assess the devices or accounts but explained the process he used for Plaintiff's devices was one that he did daily.

¶ 29     Presuming *arguendo* Ellington testified as an expert, Defendant Barrett failed

---

[5] Defendant Barrett does not argue that the flash drive was improperly authenticated under N.C. Gen. Stat. § 8C-1, Rule 901.

to demonstrate how this was prejudicial. *See State v. Babich*, 252 N.C. App. 165, 172, 797 S.E.2d 359, 364 (2017) ("Where it does not appear that the . . . admission of evidence played a pivotal role in determining the outcome of the trial, the error is harmless.") (quoting *State v. Mason*, 144 N.C. App. 20, 27-28, 550 S.E.2d 10, 16 (2001)). Here, Plaintiff testified about the text messages, emails, and social media messages and postings. Ellington's testimony was not "pivotal" in determining whether Defendants Clark and Barrett posted Plaintiff's nude breasts on the internet; rather, it corroborated Plaintiff's testimony that she sent the topless photograph to Defendant Clark. Therefore, we find no error in the trial court's decision to allow Ellington to testify.

## B. Plaintiff's IIED Claim

¶ 30    Next, Defendant Barrett contends the trial court erred by allowing Plaintiff's claim for IIED to proceed "when the conduct is subsumed by other causes of action," and by denying Defendant Barrett's post-trial motion "because there was insufficient evidence for the claim of IIED to be submitted to the jury." We disagree.

¶ 31    Whether Plaintiff's IIED cause of action is subsumed by her other asserted torts is a question of law reviewed *de novo*. *See Piazza v. Kirkbride*, 246 N.C. App. 576, 579, 785 S.E.2d 695, 698 (2016), *modified*, 372 N.C 137, 827 S.E.2d 479 (2019). "The standard of review of a ruling entered upon a motion for judgment notwithstanding the verdict is 'whether, upon examination of all the evidence in the

light most favorable to the nonmoving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence is sufficient to be submitted to the jury.'" *Everhart v. O'Charley's Inc.*, 200 N.C. App. 142, 148-49, 683 S.E.2d 728, 735 (2009) (quoting *Branch v. High Rock Realty, Inc.*, 151 N.C. App. 244, 249-50, 565 S.E.2d 248, 252 (2002)). Generally, "[i]f there is more than a scintilla of evidence supporting each element of the nonmoving party's claim, the motion for directed verdict or JNOV should be denied." *Horner v. Byrnett*, 132 N.C. App. 323, 325, 511 S.E.2d 342, 344 (1999) (citation omitted); *see also Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 172, 506 S.E.2d 267, 270 (1998). "A scintilla of evidence is defined as very slight evidence." *Hayes v. Waltz,* 246 N.C. App. 438, 442-43, 784 S.E.2d 607, 613 (2016) (citation omitted).

¶ 32 In determining whether the trial court erred in denying a JNOV, "we must take the plaintiff's evidence as true, and view all of the evidence in the light most favorable to him/her, giving him/her the benefit of every reasonable inference which may be legitimately drawn therefrom, with conflicts, contradictions, and inconsistencies being resolved in the plaintiff's favor." *Watson v. Dixon*, 130 N.C. App. 47, 52, 502 S.E.2d 15, 19 (1998) (citations and internal quotation marks omitted).

### 3. *Election of Remedies*

¶ 33 Defendant Barrett first contends the trial court erred in permitting Plaintiff to

pursue her claim for IIED, "when the conduct is subsumed by other causes of action." Defendant Barrett specifically contends that Plaintiff cannot recover under both IIED and another tort for the same conduct. Plaintiff argues Defendant Barrett failed to preserve this argument for appellate review, as Defendant "Barrett failed to plead election of remedies as an affirmative defense and raise this issue at trial."

"One is held to have made an election of remedies when he chooses with knowledge of the facts between two inconsistent remedial rights." *Lamb v. Lamb*, 92 N.C. App. 680, 685, 375 S.E.2d 685, 687 (1989) (citation omitted). "The purpose of the doctrine of election of remedies is to prevent more than one redress for a single wrong." *Triangle Park Chiropractic v. Battaglia*, 139 N.C. App. 201, 204, 532 S.E.2d 833, 835 (2000) (citation omitted). The doctrine of "[e]lection of remedies is an affirmative defense which must be pleaded by the party relying on it." *North Carolina Federal Sav. & Loan Ass'n v. Ray*, 95 N.C. App. 317, 323, 382 S.E.2d 851, 856 (1989) (citations omitted).

While Defendant Barrett contends Plaintiff's IIED claim should not have been submitted to a jury because it was subsumed by other causes of action, Defendant Barrett did not raise the defense of election of remedies at trial or in her post-trial motion. Therefore, she may not raise this argument on appeal. *Id.*; *see also State ex rel. Easley v. Rich Food Servs., Inc.*, 139 N.C. App. 691, 704, 535 S.E.2d 84, 92-93 (2000).

### 4. *Sufficiency*

¶ 36      Next, Defendant Barrett argues the trial court erred in denying her post-trial motion because Plaintiff did not present evidence to support each element of IIED. We disagree.

¶ 37      To state a claim for intentional infliction of emotional distress, a plaintiff must allege: "(1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress to another." *Norton v. Scotland Mem'l Hosp., Inc.*, 250 N.C. App. 392, 397, 793 S.E.2d 703, 708 (2017) (citation omitted). "Extreme and outrageous conduct is defined as conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).

### a. *Severe Emotional Distress*

¶ 38      Defendant Barrett contends Plaintiff failed to present evidence that she suffered from "severe emotional distress." We disagree.

¶ 39      "[T]he term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Waddle v. Sparks*, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992) (citation and emphasis omitted). However, severe emotional distress does not require medical expert testimony.

*Williams v. HomEq Serv. Corp.*, 184 N.C. App. 413, 419, 646 S.E.2d 381, 385 (2007). Testimony of a plaintiff's "friends, family, and pastors can be sufficient to support a claim. . . ." *Id.* (citations omitted).

¶ 40　　Here, Plaintiff testified at trial that she cried hysterically, hyperventilated, and sought out a counselor at a local clinic in response to the conduct of Defendants Clark and Barrett. One of Plaintiff's friends testified that Plaintiff was "very emotionally distraught and crying" on a weekly basis and that Plaintiff experienced anxiety. Although Plaintiff did not attend counseling for her anxiety on a regular basis, she testified this was out of fear that such treatment would negatively impact her probability of maintaining shared custody of her children. Taking the evidence in the light most favorable to Plaintiff, we hold there was more than a scintilla of evidence she suffered severe emotional distress as a result of the conduct of Defendants Clark and Barrett.

### b. Causation

¶ 41　　Defendant Barrett further contends the trial court erred in denying her JNOV because Plaintiff failed to show a causal link between Defendant Barrett's conduct and Plaintiff's emotional harm.

¶ 42　　Intentional infliction of emotional distress requires outrageous conduct that is intended to cause and does cause severe emotional distress. *See Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 487-88, 340 S.E.2d 116, 119-20 (1986) (citation

omitted).

> The tort may also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress. Recovery may be had for the emotional distress so caused and for any other bodily harm which proximately results from the distress itself.

*Id.* (citation omitted). Stated differently, a defendant is liable for IIED when,

> he desires to inflict serious severe emotional distress or knows that such distress is certain, or substantially certain, to result from his conduct or where he acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow and the mental distress does in fact follow.

*Dickens v. Puryear*, 302 N.C. 437, 449, 276 S.E.2d 325, 333 (1981) (cleaned up).

¶ 43    Defendant Barrett specifically contends Plaintiff failed to show her conduct caused severe emotional distress because Plaintiff experienced "stroke-like symptoms" and was diagnosed with "migraines and stress" prior to the complained of conduct – "posing as Brian Bragg, posting a Craigslist ad, posting a Facebook ad, posting a picture on Kik," all occurred after Plaintiff was hospitalized.

¶ 44    While the trial court noted Plaintiff's emotional distress included "stroke-like symptoms," it did not solely rely on such symptoms in finding Plaintiff produced evidence of severe emotional distress.   Specifically, the trial court noted, "That Defendant Barrett's conduct did cause severe emotional distress to Plaintiff in the form of anxiety, sleeplessness, and severe depression and physical manifestations,

including stroke-like symptoms." Plaintiff presented evidence that Defendant Barrett acted with a disregard to Plaintiff's emotional state and that there was a high possibility of emotional distress in that, while Plaintiff and Defendant Clark were attempting reconciliation, Defendant Barrett asked Defendant Clark to partake in *in vitro* fertilization; Defendant Barrett had an affair with Defendant Clark while Plaintiff and Defendant Clark were still married; and Defendant Barrett allowed and potentially encouraged Plaintiff's daughter to call her "Mommy."

¶ 45 There is no dispute that Plaintiff experienced "stroke-like symptoms" prior to the complained of conduct; however, Plaintiff experienced anxiety, hyperventilation, and other emotional distress as a result of the conduct of Defendants Clark and Barrett. Plaintiff testified her emotional distress was caused by Defendants Clark and Barrett messaging her that they would do "everything in [their] power to make [her] life miserable" and by discovering fake "Liz Clark" Kik profiles soliciting "no strings attached" sexual intercourse. Thus, we hold there was more than a scintilla of evidence to find a causal link between the complained of conduct and Plaintiff's emotional distress.

### c. *Outrageous Conduct*

¶ 46 Next, Defendant Barrett contends Plaintiff failed to present sufficient evidence of extreme and outrageous conduct by Defendant Barrett, because "[t]he evidence showed that Defendant Barrett did not engage with Plaintiff at all." We disagree.

¶ 47    "[T]he initial determination of whether conduct is extreme and outrageous is a question of law," to be determined by the court. *Johnson v. Bollinger*, 86 N.C. App. 1, 6, 356 S.E.2d 378, 381 (1987) (citing *Briggs v. Rosenthal*, 73 N.C. App. 672, 676, 327 S.E.2d 308, 311, *cert. denied*, 314 N.C. 114, 332 S.E.2d 479 (1985)). Conduct is considered extreme or outrageous "when a defendant's conduct exceeds all bounds usually tolerated by decent society." *Watson*, 130 N.C. App. at 52, 502 S.E.2d at 19 (citation omitted). Conduct has also been deemed "extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chidnese v. Chidnese*, 210 N.C. App. 299, 316, 708 S.E.2d 725, 738 (2011) (internal quotation marks and citation omitted).

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion . . . .

*Id.* (citation omitted).  In *Watson v. Dixon*, this Court found sufficient evidence of "extreme and outrageous behavior" where the defendant "harass[ed]" the plaintiff, and "frightened and humiliated [the plaintiff] with cruel practical jokes, which

escalated to obscene comments and behavior of a sexual nature . . . ." 130 N.C. App. at 53, 502 S.E.2d at 20.

¶ 48        Viewing the evidence in the light most favorable to Plaintiff, and taking that evidence as true, the evidence tends to show that Defendant Barrett began a sexual relationship with Defendant Clark while he was married to Plaintiff; conceived a child with Defendant Clark while Plaintiff and Defendant Clark were attempting reconciliation; and sent at least one email to Plaintiff in which Defendant Barrett told Plaintiff she "was a bad mother, that [she was] uneducated . . . [she] was a bad wife," and that Plaintiff came "from an unsuccessful family."  Further, both Defendant Barrett and Plaintiff testified Defendant Barrett resided with Defendant Clark and had access to the computer from which degrading messages were sent to Plaintiff. As Plaintiff presented more than a scintilla of evidence of "extreme and outrageous behavior," we hold the trial court did not err in denying Defendant Barrett's JNOV.

## C. Alienation of Affection

¶ 49        Next, Defendant Barrett contends the trial court lacked subject matter jurisdiction over the claim of alienation of affection and erred in denying her motion for JNOV because there was insufficient evidence of the claim.

### 1. *Subject Matter Jurisdiction*

¶ 50        Defendant Barrett contends the trial court lacked subject matter jurisdiction to hear Plaintiff's alienation of affection claim "[b]ecause alienation of affection is a

transitory tort" and Plaintiff failed to show that the injury occurred in North Carolina. We disagree.

¶ 51        "Subject matter jurisdiction is conferred upon the courts by either the North Carolina constitution or by statute." *Harris v. Pembaur*, 84 N.C. App. 666, 667, 353 S.E.2d 673, 675 (1987) (citation omitted). "Jurisdiction of the court over the subject matter of an action is the most critical aspect of the court's authority to act. Subject matter jurisdiction refers to the power of the court to deal with the kind of action in question." *Id.* (citation omitted); *see also Farquhar v. Farquhar*, 254 N.C. App. 243, 245, 802 S.E.2d 585, 587 (2017) (citation omitted). Whether a trial court is vested with subject matter jurisdiction is a question of law, reviewed *de novo. Farquhar*, 254 N.C. App. at 245, 802 S.E.2d at 587 (citations omitted).

¶ 52        Alienation of affection is "a transitory tort because it is based on transactions that can take place anywhere and that harm the marital relationship." *Hayes*, 246 N.C. App. at 443, 784 S.E.2d at 613 (quoting *Jones v. Skelley*, 195 N.C. App. 500, 506, 673 S.E.2d 385, 389-90 (2009)). "Establishing that the defendant's alienating conduct occurred within a state that still recognizes alienation of affections as a valid cause of action is essential to a successful claim since most jurisdictions have abolished the tort." *Id.* (citing *Darnell v. Rupplin*, 91 N.C. App. 349, 353-54, 371 S.E.2d 743, 746-47 (1988)). However, "even if it is difficult to discern where the tortious injury occurred, the issue is generally one for the jury." *Id.* (quoting *Jones*, 195 N.C. App. at 507, 673

S.E.2d at 390); *see also Darnell*, 91 N.C. App. at 354, 371 S.E.2d at 747.

¶ 53          In *Hayes*, the plaintiff's wife had an extramarital affair with the defendant in Cancun, Mexico. *Id.* at 440, 784 S.E.2d at 611. Thereafter, the plaintiff's wife returned to the marital home in North Carolina, and the defendant returned to his residence in Indiana. *Id.* Thereafter, the plaintiff's wife and the defendant "communicated . . . via email, telephone, and text messaging." *Id.* The defendant later came to North Carolina and took the plaintiff's wife to Indiana with him. *Id.* at 441, 784 S.E.2d at 612. The defendant was found liable for alienation of affection and appealed. *Id.* On appeal, the defendant argued the trial court improperly denied his motion for JNOV, because "all of the sexual conduct [between the defendant and the plaintiff's wife] occurred outside North Carolina." *Id.* at 443, 784 S.E.2d at 613. This Court held, however, that there was more than a scintilla of evidence that "a wrongful and malicious act" causing the alienation of the plaintiff and his wife's affection occurred in North Carolina. *Id.* at 444, 784 S.E.2d at 614-15.

¶ 54          Here, Plaintiff presented more than a scintilla of evidence that the alienation of Defendant Clark's affection occurred in North Carolina.  At the time Defendants Clark and Barrett met, Plaintiff resided in the couple's marital home in North Carolina; Plaintiff discovered text messages between Defendants Clark and Barrett while Defendant Clark was in the couple's marital home; and Plaintiff testified to a sexually explicit photograph Defendant Clark sent Defendant Barrett from the

couple's marital home. Further, although Defendant Barrett invoked her Fifth Amendment right whenever questioned about her sexual activity with Defendant Clark in North Carolina, "the finder of fact in a civil case may use a witness's invocation of his fifth amendment privilege against self-incrimination to infer that his truthful testimony would have been unfavorable to him." *In re Estate of Trogdon*, 330 N.C. 143, 152, 409 S.E.2d 97, 902 (1991) (citing *Fedoronko v. American Defender Life Ins. Co.*, 69 N.C. App. 655, 657-58, 318 S.E.2d 244, 246 (1984)). Therefore, we hold Plaintiff presented more than a scintilla of evidence that the tortious injury occurred in North Carolina.

¶ 55 Defendant Barrett further contends the aforementioned messages and photographs remain unauthenticated, and thus are not sufficient evidence to show the tortious conduct occurred in our State. However, this assignment of error is without merit as N.C. R. Evid. 901(b) permits the authentication of exhibits through testimony of a witness with personal knowledge. Here, Plaintiff testified she observed the text messages on Defendant Clark's telephone, took a picture of said messages using her cellphone, and matched the phone number of "Jane S." with that of Defendant Barrett. Accordingly, the trial court was vested with subject matter jurisdiction to hear Plaintiff's alienation of affection cause of action.

### 2. *Sufficiency*

¶ 56 Next, Defendant Barrett contends the trial court erred in denying her motion

for JNOV, because there was insufficient evidence to support each element of alienation of affection. We disagree.

¶ 57     As discussed *supra*, "[a] motion for JNOV 'should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim.' " *Hayes*, 246 N.C. App. at 442, 784 S.E.2d at 613 (quoting *Shelton v. Steelcase, Inc.*, 197 N.C. App. 404, 410, 677 S.E.2d 485, 491, *disc. review denied*, 363 N.C. 583, 682 S.E.2d 389 (2009)). To succeed on an alienation of affection claim, a plaintiff must present evidence demonstrating "(1) a marriage with genuine love and affection; (2) the alienation and destruction of the marriage's love and affection; and (3) a showing that defendant's wrongful and malicious acts brought about the alienation of such love and affection." *Heller v. Somdahl*, 206 N.C. App. 313, 315, 696 S.E.2d 857, 860 (2010) (citation omitted); *see also Hayes*, 246 N.C. App. at 443, 784 S.E.2d at 613 (citation omitted).

### a. Love and Affection

¶ 58     Defendant Barrett specifically argues that "[t]here was no genuine love and affection in Plaintiff's marriage," because "from the very beginning of their marriage, the parties had an unhappy marriage, full of infidelity and arguments."

¶ 59     To succeed on an alienation of affection cause of action, "the plaintiff need not prove that he and his spouse had a marriage free from discord, only that some affection existed between them." *Nunn v. Allen*, 154 N.C. App. 523, 533, 574 S.E.2d

35, 42 (2002) (citing *Brown v. Hurley*, 124 N.C. App. 377, 477 S.E.2d 234 (1996)). "The marriage need not be a perfect one, but plaintiff's spouse must have had '*some* genuine love and affection for him before the marriage's disruption." *Heller*, 206 N.C. App. at 315, 696 S.E.2d at 860 (emphasis in original) (quoting *Brown*, 124 N.C. App. at 381, 477 S.E.2d at 23). "Even if a plaintiff's spouse retains feelings and affections for a plaintiff, an alienation of affections claim can succeed." *Id.* at 316, 696 S.E.2d at 861 (citation omitted).

¶ 60         Here, Plaintiff testified the couple would "try to keep intimacy alive even though" the couple often would be separated by distance due to Defendant Clark's Military assignments.  While married, Defendant Clark would visit Plaintiff on weekends, and the couple would text message and call each other often.  Defendant Clark "would constantly say, I love you; are you coming over," and the couple continued to have sexual intercourse after their separation.  The couple had sexual relations when Defendant Clark visited North Carolina while studying at Fort Belvoir and continued to have sexual relations after Defendant Clark left the marital home.  Defendant Clark texted Plaintiff, "I love you" when Plaintiff requested a copy of the video of the couple engaged in sexual intercourse.

¶ 61         Although Defendant Clark testified that he did not love his wife or that there were "problems with that love," Plaintiff need only present "very slight evidence" of some love and affection to survive a motion for JNOV. *See Hayes*, 246 N.C. App. at

442-43, 784 S.E.2d at 613 ("A scintilla of evidence is defined as very slight evidence." (citation omitted)). Accordingly, we hold Plaintiff presented more than a scintilla of evidence of a genuine love and affection between Plaintiff and Defendant Clark.

### b. *Alienation of Affection*

¶ 62 Defendant Barrett further contends the trial court erred in denying her motion for JNOV because "Plaintiff failed to produce evidence that Defendant Barrett engaged in actionable unlawful conduct."

¶ 63 "The alienation and destruction element [of alienation of affection] is proved by showing 'interference with one spouse's mental attitude toward the other, and the conjugal kindness of the marital relation." *Heller*, 206 N.C. App. at 315-16, 696 S.E.2d at 860-61 (quoting *Jones*, 195 N.C. App. at 507, 673 S.E.2d at 390 (citation omitted)). "The loss" of affection "can be full or partial and can be accomplished through one act or a series of acts." *Id.* at 316, 696 S.E.2d at 861 (citing *Darnell*, 91 N.C. App. at 354, 371 S.E.2d at 747). "In the context of an alienation of affections claim, a wrongful and malicious act has been 'loosely defined to include any intentional conduct that would probably affect the marital relationship.' " *Hayes*, 246 N.C. at 444, 784 S.E.2d at 613 (quoting *Jones*, 195 N.C. App. at 508, 673 S.E.2d at 391 (citation omitted)).

¶ 64 Here, Plaintiff testified Defendant Clark's behavior began to change after he met Defendant Barrett in that he did not travel home to North Carolina as often; he was short with her on the telephone; and he did answer his phone or text Plaintiff as

often. When Plaintiff could not reach Defendant Clark over the phone, she "traced or tracked" his cellphone to Defendant Barrett's room. Upon confronting Defendant Clark about the extramarital affair, Defendant Clark moved out of the couple's marital home and the couple separated.

¶ 65 Plaintiff presented further evidence that Defendant Barrett knew Defendant Clark was married at the time the Defendants met. Regardless of this knowledge, Defendant Barrett chose to carry on a sexual relationship and conceive a child through *in vitro* fertilization with Defendant Clark. Defendants Barrett and Clark spoke on the phone, text messaged, and sent at least one sexually explicit photograph. Thus, we hold Plaintiff presented more than a scintilla of evidence regarding the malicious or wrongful alienation of affection.

### c. *Wrongful and Malicious Causation*

¶ 66 Defendant Barrett argues that her conduct did not cause the loss of affection between spouses because the couple's extramarital affairs and arguments caused the couple to separate. "However, it is well established that while the defendant's conduct must proximately cause the alienation of affections, this does not mean that the 'defendant's acts [must] be the sole cause of the alienation, as long as they were the controlling or effective cause.' " *Hayes*, 246 N.C. App. at 446, 784 S.E.2d at 615 (citation omitted) (alteration in original); *see also Nunn*, 154 N.C. App. at 533, 574 S.E.2d at 42 (citation omitted).

¶ 67    Upon meeting Defendant Barrett, Defendant Clark's behavior within his marriage and toward his wife changed. Ultimately, Plaintiff and Defendant Clark separated, and Defendant Clark now resides with Defendant Barrett on the property he purchased with Plaintiff. Thus, Plaintiff presented a scintilla of evidence regarding causation.

**D. Damages**

¶ 68    Defendant Barrett further contends the trial court erred in denying her motion for JNOV because "[t]he damages awarded to Plaintiff were improper and the evidence insufficient."

¶ 69    The trial court has discretion to grant a new trial where the jury awards "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice." N.C. R. Civ. P. 59(a)(6). However,

> our appellate courts should place great faith and confidence in the ability of our trial judges to make the right decision, fairly and without partiality, regarding the necessity for a new trial. Due to their active participation in the trial, their first-hand acquaintance with the evidence presented, their observances of the parties, the witnesses, the jurors and the attorneys involved, and their knowledge of various other attendant circumstances, presiding judges have the superior advantage in best determining what justice requires in a certain case.

*Worthington v. Bynum*, 305 N.C. 478, 487, 290 S.E.2d 599, 605 (1982). "Consequently, an appellate court should not disturb a Rule 59 order unless it is

reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." *Id.*

¶ 70 In the context of alienation of affection,

> the measure of damages is the present value in money of the support, consortium, and other legally protected marital interests lost by her through the defendant's wrong. In addition thereto, she may also recover for the wrong and injury done to her health, feelings, or reputation.

*Hutelmyer v. Cox*, 133 N.C. App. 364, 373, 514 S.E.2d 554, 561 (1999) (quoting *Sebastian v. Kluttz*, 6 N.C. App. 201, 219, 170 S.E.2d 104, 115 (1969)). "[T]he gravamen of damages in [heartbalm] torts is mental distress, a fact that gives juries considerable freedom in their determinations." *Id.* (quoting 1 Suzanne Reynolds, Lee's North Carolina Family Law § 5.48(A) (5th ed. 1993)).

¶ 71 In *Hayes*, the trial court denied the defendant's Rule 59 motion and determined the plaintiff presented sufficient evidence in that he lost the emotional and financial support of his wife and the marital home; suffered a diminished household income; and was "devastated" emotionally." 245 N.C. App. at 452, 784 S.E.2d at 618. Here, Plaintiff testified she cried frequently, and her friend reported Plaintiff experienced anxiety. Due to the discovery of Defendants Clark and Barrett's relationship, Plaintiff was hospitalized for "stroke-like symptoms." Plaintiff is employed as a bartender/server, whereas Defendant Clark holds the rank of Major in the U.S. Army

and, accordingly, has a higher earning potential. Plaintiff assumed half of the marital debt and cares for the couple's two minor children, one of whom has special needs. Plaintiff further presented evidence of the loss of benefits provided to her as a spouse of an active duty servicemember, including medical and life insurance, and Defendant Clark's pension. Accordingly, the trial court did not abuse its discretion in concluding $450,000 in compensatory damages was not excessive.

¶ 72        Defendant Barrett further contends the trial court erred in denying her post-trial motion where the trial court declined to instruct the jury on punitive damages for the alienation of affection claim. The trial court, here, instructed the jury regarding punitive damages for Plaintiff's IIED claim. The trial court did not instruct the jury on punitive damages in connection with alienation of affection, because, under *Oddo v. Presser*, 358 N.C. 128, 592 S.E.2d 195 (2004), there must be proof of sexual relations before the date of physical separation for punitive damages. Contrary to Defendant Barrett's contention, there is no requirement of pre-separation sexual intercourse to recover punitive damages for IIED.

¶ 73        Defendant Barrett also argues that the trial court failed to make findings of fact regarding all the factors enumerated in N.C. Gen. Stat. § 1D-35(2). However, the jury is not mandated to consider all factors enumerated in Section 1D-35. The plain language of the statute allows the trier of fact to consider the factors, but it is not a requirement. Accordingly, we hold the trial court did not err in denying Defendant

Barrett's post-trial motion regarding damages.

### III.    Conclusion

After careful review of the record and applicable law, we hold the trial court properly exercised subject matter jurisdiction over Plaintiff's alienation of affection claim and did not err in either the admission of Ellington's testimony or denial of Defendant Barrett's motion for JNOV.

NO ERROR AND AFFIRMED.

Judges TYSON and HAMPSON concur.